STATE of Tennessee, Appellee,

v.

Joseph DICK, Appellant.

Court of Criminal Appeals of Tennessee,
at Nashville.

April 15, 1993.

Permission to Appeal Denied by
Supreme Court Sept. 7, 1993.

Charles R. Ray, Nashville, for appellant.

Charles W. Burson, Atty. Gen., Kimbra R. Spann, Asst. Atty. Gen., Nashville, Tom P. Thompson, Jr., Dist. Atty. Gen., John D. Wootten, Asst. Dist. Atty. Gen., Hartsville, for appellee.

## OPINION

BIRCH, Judge.

Joseph Dick, the defendant, was found guilty of first-degree murder by a Macon County jury. The trial court entered judgment upon the verdict, overruled his motion for new trial, and sentenced Dick to the Department of Correction for life.

Dick appeals as of right. He contends that the convicting evidence was insufficient as a matter of law to support the jury's verdict. He also presents several other issues: namely,

1. Whether a warrant to search was issued upon sufficient probable cause;
2. Whether a witness's remarks warranted a mistrial;
3. Whether the trial court erred in failing to declare a mistrial after a juror was notified of a personal crisis;
4. Whether the trial court's comments or inquiries to the jury constituted reversible error;
5. Whether the jury received extraneous prejudicial information; and
6. Whether a juror's *voir dire* responses constituted *propter affectum* and required reversal of the judgment.

We have carefully reviewed the record and painstakingly considered the issues raised by the defendant. For the reasons stated be-

low, we affirm the judgment of the trial court.

I

Roxanne Shapiro Dick[1] was reported missing by her husband, the defendant, on 21 November 1989. Her body was found on 25 November 1989. Her skull had been severely fractured; she had been stabbed three times, and her body had been stuffed into the back seat of her car.

The record establishes that Dick and Shapiro had been married for approximately two months before they decided to leave Cincinnati to make a home in the Nashville area. They arrived in Nashville in March 1989. During the first few weeks of November 1989, the Dicks were experiencing serious marital problems. So serious were these problems that they led to estrangement, and Shapiro was considering divorce.

The defendant worked for the Tennessee Valley Exterminating Company. In this job, he made house calls to addresses provided by the company. He would inspect the foundation joists for termite infestation and try to sell the occupant termite treatment and protection. Dick and other salespersons were often sent to other counties to work. Because of this required travel, the company provided them with trucks. The trucks were of various colors, but each displayed the words "Tennessee Valley Exterminating Company" on its door. Joe Johnson, the owner of the company and Dick's supervisor, testified that the vehicle issued to Dick was a Nissan pick-up truck—beige in color.

In October 1989, Shapiro accepted a job with Combined Insurance Company. She sold insurance door-to-door and collected premiums from existing policy holders. Her supervisor, Carla Tillett, would assign each sales representative an area to cover. These assignments were made on Sunday for the week to follow. Shapiro told Dick on Sunday where she would be working throughout the week beginning 20 November 1989.

Georgia Suel was a real estate agent who was assisting the Dicks in the purchase of the house in which they were already living.

During the fall of 1989, the relationship between Suel and the defendant became close. They talked with each other several times a day. On 17 November 1989, Dick told Suel that he thought Shapiro was seeing someone else. He was very angry and upset. He threatened to kill Shapiro, and he mentioned at least two methods—stabbing her to death and setting his German Shepherd dog upon her. He also told Suel, in the same conversation, that if anything happened to Shapiro, he could take the proceeds from her life insurance policy and pay cash for the house.

On Monday, 20 November 1989, the defendant told several friends and co-workers of an agreement he had made with Shapiro to meet that evening at 7 p.m. to attempt reconciliation. He told each of these persons the specific time and place of the planned meeting. Shapiro was not home by 7 p.m. She still had not arrived at 7:10 p.m., so Dick left to go to a local bar. After he returned back home and into that night, Dick called friends and acquaintances in search of Shapiro. These efforts were unsuccessful. No one knew where Shapiro was, and no one had heard from her.

Dick reported for work on 21 November 1989 and called Metro Nashville police to report his wife missing. A patrol officer responded and advised Dick to make the report in Rutherford County, his county of residence.

Dick testified that after he spoke with the patrol officer, Johnson fired him. Johnson testified that Dick came into the office and quit after talking with the police. In any case, Dick removed personal items from his assigned truck and hitched a ride home with another salesman. Among these personal items was clothing worn during under-house inspections. Upon arriving home, he left the clothes in a pile in his driveway and reported to the LaVergne Police Department that his wife was missing.

The LaVergne authorities had determined that Shapiro's last work assignment would have taken her to Macon County, and they relayed the missing person report to the Macon County authorities. Lieutenant Jerry

1. Hereinafter, we will refer to the victim as Shapiro to differentiate her from the defendant.

Dallas, of the Lafayette Police Department, received the report on 22 November 1989. He started investigating the case, but progress was slow. He did, however, locate a witness who had seen Shapiro between 11:30 a.m. and 12 noon on 20 November 1989.

Also on 22 November 1989, Dick or his mother telephoned David Wood, the agent from whom he had recently purchased a policy insuring Shapiro's life for a little over $50,000. Wood was not in the office, so Dick left a message. Wood returned Dick's call on 27 November 1989. He reached Dick's mother, and she inquired about the procedure to collect on the policy.

On 25 November 1989, Keith Dunshee, a mail carrier, discovered Shapiro's car in an obscure weeded area off Clampett Hollow Road in Macon County. Dunshee took a closer look and saw the body of a female inside the car. He went immediately to the nearest house and informed Sheriff Mercer of Macon County by telephone of his discovery.

Mercer went to the Clampett Hollow location with his Chief Deputy, Joe Ferguson. On arrival, they confirmed Dunshee's information, preserved the crime scene, and called Dallas. Dallas arrived within a short time. When he opened the car door, he smelled a strong gasoline odor. The windows of the car were smoked. The headliner of the car was charred, the victim's hair was burnt, and her hose melted. Her body had literally been stuffed in the rear seat with her legs doubled under.

The defendant was notified on 25 November 1989 that his wife's body had been found. On this occasion, before Dallas had informed Dick of any details, Dick asked if "she was shot, stabbed—stabbed and just stuffed in the back seat of her car." Additionally, when the autopsy order was given to Dick, he tore it into pieces and threw it into a trash container. Moreover, Dallas testified that Dick feigned grief: that is, he would cover his eyes, make crying noises, and peek out from

under his hands to see if Dallas was looking at him.

When questioned about his whereabouts on 20 November 1989, Dick stated that he had worked in Shelbyville that day. His first appointment was at 10 a.m. He said he ate lunch at the Carter's Family Restaurant from 12 noon to 12:30 p.m. and called Johnson from a pay phone inside the restaurant between 12:30 and 1 p.m.[2] There is no such restaurant in Shelbyville. Subsequently, when Dallas interviewed him on 4 December 1989, Dick said he ate lunch at and called from Richard's Family Restaurant. At trial, the defendant testified that he ate lunch and called Johnson from The Pantry on Highway 41 on November 20. A call had in fact been received at Tennessee Valley Exterminating Co. at 12:50 p.m. from The Pantry on Highway 41 on 20 November 1989. A call was placed to The Pantry pay phone from Johnson's office at 12:55 p.m. However, there were several other salespeople in the Shelbyville area that day, and no one at Johnson's office could unequivocally confirm that the call in question had been made by Dick.

On 26 November 1989, Dallas and Ferguson returned to the scene to make a daylight search for additional evidence. Ferguson found a small paring knife. This knife was identified at trial by Sara Conder, Shapiro's best friend, as having come from Shapiro's kitchen. On 26 November 1989, Dallas also received a call from Dick's mother asking if it was all right to dispose of the victim's belongings. After the call, Dallas and another officer, James Jenkins, went to the house and obtained Dick's consent to search the premises. During this consent search, Jenkins and Dallas examined the pile of clothing left in the driveway. Both officers testified they detected the smell of gasoline on the clothes. Among the clothes, Dallas said he saw a blue plaid flannel shirt and a camouflage cap.

On the morning of 27 November 1989, Dallas received a call from Deborah Comp-

---

**2.** Dick and the other salespeople were required to call Johnson each day and report on their progress. They would call Johnson person-to-person, and the secretary would say that Johnson was not in and take the number where he could call them back. Johnson would then immediately call the salesperson back and receive his report. This method allowed Johnson to pay less for the call.

ton,[3] a resident of Clampett Hollow. Compton told Dallas that on Monday, 20 November 1989, she had seen a light-colored truck and a car pulled off the road where the body was found. She said she saw two men standing by the truck—one of them was wearing a blue plaid flannel shirt and a camouflage cap.

Upon receiving this information from Compton, Dallas remembered having seen similar items in the clothing piled in Dick's driveway. He obtained a search warrant and seized the clothing. A camouflage cap was not among the items seized, but a blue plaid flannel shirt was.

Carolyn Overton had been working at the C & C Market on 20 November 1989 and saw Shapiro there around 11:30 a.m. She remembered Shapiro because she was well-dressed and had mentioned that she was selling Combined Insurance. Overton also accurately described the car Shapiro was driving. Overton testified that she saw another vehicle outside—a white pick-up truck—at the time Shapiro was in the store. Overton testified that it had "Tennessee Valley Exterminating Company" on the door. She said she wrote down the name "Tennessee Valley Exterminating Company" on a piece of paper. Apparently, Overton's husband had invented a device which he was trying to sell to exterminating companies. Since Overton had not seen this particular company in the area before, she thought her husband might want to contact them.

Finally, Dr. Charles Harlan, the coroner, testified that Shapiro had died at least 72 hours prior to the autopsy, which was conducted at 1:30 p.m. on 26 November 1989. He opined that Shapiro died of blunt trauma to the head and multiple stab wounds to the chest and abdomen. One of the stab wounds penetrated five inches into her body.

Dick testified and presented an alibi defense. The linchpin of this defense was the telephone call made from a phone outside The Pantry in Shelbyville at 12:50 p.m. on 20 November 1989 to the office and the return

call made to that same telephone. Dick swore that he initiated the call from the Pantry, and he swore that he received the return call. Dick's theory was that in view of the fact that Shapiro was last seen alive as late as 11:45 a.m. or 12 noon on 20 November 1989, he could not have possibly travelled the 91.2 miles between Clampett Hollow and Shelbyville in time to use that particular telephone to make and receive the calls described above.

## II

■ By pretrial motion, the defendant sought to suppress evidence obtained through the execution of a warrant issued for the search of his residence at 106 Tara Drive, LaVergne, Rutherford County. The defendant lists three grounds for suppression:

1. The affidavit upon which the search warrant was issued failed to meet *Aguilar*[4]*–Spinelli*[5] standards as adopted in *State v. Jacumin;*[6]

2. The nexus between the items seized and the crime is vague and nebulous; and

3. Dallas omitted material facts from his affidavit which would have negated probable cause.

Evidence developed at the suppression hearing established that Shapiro's body was discovered in the Clampett Hollow area of Macon County. As a result of a request by the defendant's mother for permission to dispose of the victim's belongings, Dallas went to the defendant's residence at 106 Tara Drive in LaVergne, Rutherford County. While there, the defendant gave Dallas written permission to search the premises.

While the investigators were on the premises, they observed, but did not seize, several items of clothing, including a camouflage cap, a blue plaid shirt, a towel, a sheet, overalls, and boots.

The next morning, 27 November 1989, Dallas received a telephone call from Deborah

---

3. Compton testified at trial.

4. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

5. *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

6. *State v. Jacumin,* 778 S.W.2d 430 (Tenn.1989).

Compton. A resident of Clampett Hollow, she informed him that on 20 November 1989 she saw a light-colored truck, a car, and two men on Clampett Hollow Road where the body had been discovered. One of the men, she said, had been wearing a blue plaid shirt and a camouflage cap.

Dallas recalled that he had seen similar items at Dick's residence the previous day. He put this information in an affidavit that contained most of the other information about the crime he had uncovered up to that time and presented it to the Rutherford County magistrate. However, Dallas did not mention Compton by name.

The magistrate issued the warrant authorizing the seizure of clothing, caps, boots, towels, and sheets. The investigators executed it, and as a result, they seized a blue plaid shirt.

On the basis of the proof we have outlined above, the trial court refused to order suppression of the items seized.

On this issue, the defendant first contends that the affidavit failed to meet the *Aguilar–Spinelli* two-pronged test as required by *State v. Jacumin, supra.* Specifically, the defendant argues that the affidavit fails to establish the reliability of the informant.

■ In *State v. Melson,* our Supreme Court discussed the legal distinction between the "citizen-informant" and other informants. The reliability of the "citizen-informant" is judged by a different standard than that of the typical criminal informant or "tipster." *State v. Melson,* 638 S.W.2d 342 (Tenn.1982). In *State v. George,* the holding of *Melson* was summarized as:

> a citizen informer who provides information to police officers is entitled to greater belief in his veracity and his credibility than would be a typical police informer who, in some instances, are themselves criminals. Such a person acting openly, in the aid of law enforcement by reporting evidence of a crime to the police, is entitled to greater belief because he has no personal interest in the defendant's arrest, nor does he normally anticipate any personal benefit in exchange for his information.

*State v. George,* 706 S.W.2d 91, 93 (Tenn. Crim.App.1985). The information provided by Compton was corroborated by Dallas' own observations of the defendant's clothes.

We find that the affidavit fulfilled the reliability prong of *Aguilar–Spinelli–Jacumin.*

■ Second, the defendant complains of an insufficient nexus between the crime and the items seized. Since the clothing, in and of itself, is not necessarily indicative of criminal activity, there must have been some articulable connection between the clothing and the crime. *See State v. Berry,* 592 S.W.2d 553 (Tenn.1980). This connection was supplied by Compton's statements to Dallas. In our view, the affidavit contains information sufficient to establish the required nexus.

■ Last, the defendant asserts that material facts omitted by Dallas would have negated probable cause. To support this ground, the defendant points to Compton's testimony given at the suppression hearing. In her testimony, she stated that on 20 November 1989, she had observed two men and two vehicles in Clampett Hollow near where the body was discovered. In his affidavit, however, Dallas stated that Compton said, "two persons," rather than "two men." The defendant characterized this difference as an omission on Dallas' part. Nevertheless, Dallas insisted, in the same hearing, that Compton had used the phrase "two persons."

The trial court found that Dallas made no false statement in his affidavit.

■ The findings of fact and conclusions of law made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict; this court will not set aside the judgment of the trial court unless the evidence contained in the record preponderates against its findings. *State v. Killebrew,* 760 S.W.2d 228 (Tenn.Crim.App.1988). The defendant has not carried his burden.

This issue is, accordingly, overruled.

### III

Three of the defendant's issues fall under

the heading of evidentiary sufficiency.[7]

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832 (Tenn.1978). This court must view the evidence in the light most favorable to the state and can set aside Dick's conviction only if the evidence is insufficient for any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle,* 639 S.W.2d 913 (Tenn.1982).

It is not the function of this court to reweigh evidence adduced at a criminal trial. A guilty verdict, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in testimony in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627 (Tenn. 1978).

The jury, as indicated by their verdict, chose to accredit the theory of the state and to reject the theory of the defendant, as they had a right to do.

After viewing all of the evidence in the light most favorable to the state, we hold that any rational trier of fact could have found the essential elements of premeditated murder beyond a reasonable doubt. We hold, therefore, that the convicting evidence is legally sufficient. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. at 307, 99 S.Ct. at 2781; *State v. Williams,* 657 S.W.2d 405 (Tenn. 1983).

## IV

The defendant argues that the trial court's refusal to declare a mistrial constitut-ed grounds for reversal. The defendant bases this contention on the testimony of Sara Conder.

Conder testified as a state's witness. In testimony given in a prior proceeding, she testified about having read a note written by the defendant to the victim. She described this note as a "hate letter." Fearful that the witness would repeat this description at trial, the defendant requested that the witness be admonished. The trial court did admonish the witness, albeit rather generally. Despite this admonishment, the witness again described the note as a "hate letter." The trial court responded with a curative instruction.

In view of the trial court's swift response and the strength of the evidence against the defendant, we do not find the existence of "manifest necessity" as would warrant a mistrial. *State v. Millbrooks,* 819 S.W.2d 441 (Tenn.Crim.App.1991).

Moreover, the decision of whether to grant a mistrial is within the discretion of the trial court. We will not disturb that decision absent a finding of abuse of that discretion. *State v. Adkins,* 786 S.W.2d 642 (Tenn.1990). The trial court's refusal is amply justified by the record and indubitably proper. This issue is overruled.

## V

The defendant asserts that certain occurrences after submission of the case to the jury but before the verdict had been reported constituted reversible error.

The first of these occurrences concerns Rita Fleming, a juror. The defendant contends that the verdict was tainted by extraneous prejudicial information received by Fleming and that the trial court erred by allowing the jury to continue to deliberate after receipt of this extraneous information.

When it had become apparent that deliberations would continue into the early evening, the trial court allowed jurors to advise their families by telephone that they would be detained. When Fleming called home, she

---

7. Two of these issues concern the defendant's motion for acquittal under Rule 29(c) Tennessee Rules of Criminal Procedure, and in the last issue, the defendant contends that evidence of premeditation was lacking.

learned of an accident at her mother-in-law's home. She asked the officer into whose charge the jury had been placed to try to determine the details. She was then informed that her nephews had been struck by a car. She did not know how serious the accident was or how badly the children were hurt.

At 7:30 p.m., the jury returned to the courtroom, and in her affidavit, Fleming stated that she saw her aunt in the audience. She said that her aunt did not appear upset. From this demeanor, Fleming concluded that the situation was under control and "everything was all right." Fleming told the court that she was all right and wanted to continue to participate in the deliberations. The court obliged.

Discussion occurred at this time between the trial judge and the jurors about whether further deliberations were warranted. Upon inquiry by the trial court, ten jurors believed that further deliberations would be fruitless. At this point, the trial court said:

> I'll tell you what let's do, its 20 minutes to 8. We just went through this telephone call and you've had your dinner. Let's go to about 8 o'clock, and I'm not putting that as a deadline, but I want you to report back about 8 o'clock and see where you stand, then I'll make a decision.

At 8 p.m., the jury sent word that they needed some more time, and the trial court responded that they could take as much time as they needed. At 8:45 p.m., the jury returned its verdict.

Finally, Fleming stated in her affidavit that she had made up her mind about the verdict early in the deliberations, and the accident did not influence her decision.

Tennessee Rule of Evidence 606(b) states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations ... except that a juror may testify on the question of whether extrane-

ous prejudicial information was improperly brought to the jury's attention. . . .

While it may be possible that news of a serious accident could constitute "extraneous prejudicial information" with respect to a juror under certain circumstances, we do not believe the instant case contains such circumstances. In this case, Fleming stated that she was not influenced by the accident; rather, her decision had been reached early on in the deliberations. The trial court obviously accredited Fleming's statement that she wished to continue.

The defendant argues that the other jurors were influenced and ultimately based their decision to convict Dick on their perception that a quick verdict would permit Fleming to go home. We do not agree. The trial judge made it clear that he was willing to allow Fleming to go home if she so desired. He told her in the presence of the other jurors that he would allow her to go home and deliberations could be delayed until the following week. Furthermore, there is no evidence that any juror's decision was affected by any matter concerning Fleming. This issue is without merit.

 The second complaint concerns the trial judge's inquiry about the specifics of the jury's inability to reach unanimity: that is, the numerical division. The foreperson responded that it was "nine and three." The foreperson did not divulge further specifics of the division.

We think the trial judge's inquiry was unnecessary. We know of no logical relationship between the numerical division of the jury and the length of time necessary to reach unanimity or to decide that further deliberations would be fruitless. *See Kersey v. State*, 525 S.W.2d 139 (Tenn.1975); *Bass v. Barksdale*, 671 S.W.2d 476 (Tenn.App.1984).

However, after reviewing the record, we conclude the conduct, if error at all, was harmless. The trial judge did not follow this inquiry with an *Allen*[8] charge. *See Kersey*, 525 S.W.2d 139. There is no evidence offered by the defendant that the judge's inqui-

---

8. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (also known as a "dy-

namite charge").

ry affected the verdict. This issue is without merit.

■ The third contention is that the trial court erred in comments made to the jury after their announcement that they were unable to reach a verdict. The challenged comments are:

THE COURT: Well, you haven't been out that long really. We don't need to know how you're individually split, guilty or innocent, but if you're still discussing the case, and you need to discuss it, and if you reach a point that you just absolutely know that you're not going to be able to do anything, that's when you need to let us know. You need to get to that point, or to the point where you've reached a verdict, then you need to come back, either way. But, it's only 4 o'clock, and we've got a couple or three good hours here that we can work on this, and have plenty of time today. So you all take your time and go through it and discuss it, look at the charge we have given you and work with it, because that's what you're supposed to do. You're supposed to discuss it, take votes and that type thing. If you all will do that. Go back and have refreshments; are there cokes and things?

We find nothing objectionable in these comments. This issue is without merit.

## VI

In his motion for new trial, the defendant attached affidavits from three jurors in which they state that the foreperson made the following comment:

if the defendant is not found guilty and there is a hung jury, the state will not try the defendant again the defendant will be loose on the streets where he will murder someone else within a year and it will be someone else's problem.

The defendant contends that someone made this comment to the foreperson who in turn repeated it to the jurors and, therefore, the verdict is tainted by extraneous prejudicial information. The foreperson admitted that he made the comment but stated that the comment was of his own creation. The defendant has proffered no evidence whatsoever to support his contention. This issue is without merit.

## VII

■ In his final issue, the defendant insists that he is entitled to a new trial because one juror was not a resident of Macon County.

Juror Jimmy Hesson was born and raised in Macon County. He received mail at his house in Macon County. His driver's license was issued in Macon County. Hesson testified that he and his wife spent most weekends in Macon County. However, he and his wife voted, owned a home, paid property taxes, and worked in Davidson County.

According to some authorities, Hesson could be considered a resident of Macon County. The statute which sets forth the qualifications for serving as a juror does not define "resident" and the term has an amorphous meaning in the law. In most instances, it is defined in opposition to "domicile." In Tennessee, we recognize that an individual may have more than one residence but may have only one domicile. *Brown v. Brown,* 150 Tenn. 89, 261 S.W. 959 (1924). In *Brown* for instance, the court found that the defendant had two residences: that is, a dwelling house and a summer house. However, "resident" could just as easily be construed as "legal residence" which is synonymous with "domicile." *Bearman v. Camatsos,* 215 Tenn. 231, 385 S.W.2d 91 (1964). Construed as the latter, Hesson would not be a resident of Macon County. We conclude that Hesson's affirmative answer to the residency question at *voir dire* was arguably correct.

Although under one definition, Hesson would have been subject to challenge for cause at *voir dire,* this type of disqualification is clearly "propter defectum." As such, it is usually waived if not raised prior to the verdict. *Lindsey v. State,* 189 Tenn. 355, 225 S.W.2d 533 (1949). Waiver does not occur if bias is shown to exist or if the juror answered falsely. *Endowment Rank of Order of K.P. v. Steele,* 107 Tenn. 1, 63 S.W. 1126 (1901). The defendant has not shown evidence of bias. We cannot say with certainty that Hesson answered falsely; however, given the uncertainty of the term "residence" in

general, we will consider the effect of a non-resident serving upon a jury.

A careful review of the case law has revealed no Tennessee law on this particular subject. We conclude that the defendant is not entitled to a new trial simply because a juror failed to make technically accurate or complete responses to questions concerning his qualifications to serve. Rather, in order for a new trial to be warranted, the defendant must establish that the juror's failure to respond correctly prejudiced the rights of the defendant. Absent some showing that the verdict was affected, the defendant is not entitled to a new trial. Such is the prevailing rule in other jurisdictions. *See People v. Johnson,* 206 Ill.App.3d 318, 151 Ill.Dec. 255, 564 N.E.2d 232 (4 Dist.1990); *State v. Wyss,* 124 Wis.2d 681, 370 N.W.2d 745 (1985); *State v. Coles,* 328 N.W.2d 157 (Minn.1983); *Bufford v. State,* 382 So.2d 1162 (Ala.Crim.App. 1980).

Hesson's testimony at the motion for new trial hearing established that he did not intentionally reply inaccurately to the residency question at *voir dire.* His testimony amply supports the conclusion that his service in no way prejudiced the rights of the defendant. Therefore the issue is overruled.

In all things, we affirm the judgment of the trial court.

JONES and SUMMERS, JJ., concur.