IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

FEBRUARY SESSION, 1999

FILED

June 4, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9803-CC-00105 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | BLOUNT COUNTY |
| VS. | ) | |
| | ) | HON. D. KELLY THOMAS, JR. |
| WILLIAM DOTSON, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Direct Appeal - Attempted Second |
| | ) | Degree Murder and Aggravated |
| | ) | Robbery) |


FOR THE APPELLANT:

JOE COSTNER
315 High Street
Maryville, TN  37804

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

TODD R. KELLEY
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243-0493

MIKE FLYNN
District Attorney General

EDWARD P. BAILEY, JR.
KIRK ANDREWS
Assistant District Attorneys
363 Court Street
Maryville, TN  37804


OPINION FILED _____

REVERSED AND REMANDED

JERRY L. SMITH, JUDGE

# <u>OPINION</u>

On February 20, 1990, Appellant William Dotson was indicted by the Blount County Grand Jury for attempted first degree murder, aggravated assault, and aggravated robbery. After a jury trial on November 19–22, 1996, the jury acquitted Appellant of attempted first degree murder, but failed to reach a verdict on the charge of aggravated robbery, the charge of aggravated assault, and on all lesser included offenses of attempted first degree murder and aggravated robbery. Appellant was subsequently tried for attempted second degree murder and aggravated robbery on July 15–17, 1997. On July 17, 1997, Appellant was convicted of attempted second degree murder and aggravated robbery. On February 23, 1998, the trial court sentenced Appellant as a Range I standard offender to consecutive terms of twelve years for each conviction. Appellant challenges his convictions, raising the following issue: whether the trial court erred when it refused to grant a mistrial after a witness for the State testified that Appellant had been arrested for a federal parole violation. After a review of the record, we reverse the judgment of the trial court and remand for a new trial.

## FACTS

Steven Bartlett testified that he was working as a gas attendant at the Smoky View Market in Blount County on December 31, 1989. At approximately 11:00 p.m., Bartlett was checking the gas pumps when a dark-colored 1979 Camaro pulled into the parking lot. When two men wearing ski masks and

carrying guns got out of the Camaro and went into the store, Bartlett hid behind a gas pump. While he was behind the pump, Bartlett could see that the driver of the Camaro had remained in the vehicle. Bartlett identified the driver as Larry Goodwin. The two men stayed in the store for approximately five to ten minutes before getting back in the Camaro.

Kari Irwin testified that she was working at the Smoky View Market on December 31, 1989, when she heard a customer scream. Irwin then looked up and saw one man pointing a gun at her and saw another man with a gun standing next to a pay phone by the door. The man who was pointing a gun at Irwin ordered her to open the cash register. Irwin opened the register, and the armed man took the money from the register and took a bag that had money in it. Irwin testified that even though both of the armed men were wearing ski masks, she could tell that the man pointing the gun at her was Caucasian and had blue eyes. When the two men left, Irwin called the owner of the store and the police. Irwin could not identify the man who pointed a gun at her.

Deputy Jerry Orr of the Blount County Sheriff's Department testified that on the evening of December 31, 1989, he received a report that there had been an armed robbery at the Smoky View Market. Orr also received information that a 1970's model dark-colored Camaro was involved in the robbery. Shortly thereafter, Orr saw a vehicle that matched the description he had been given. Orr then notified some other police officers that he had seen the vehicle and he began pursuit. When Orr turned on the blue lights of his police vehicle, the front

passenger of the Camaro climbed through the window, sat on top of the door, and fired three shots at Orr. Orr testified that the man who shot at him had the same amount of baldness as Appellant.

Orr testified that as he continued the pursuit of the Camaro, he and the front passenger of the Camaro exchanged gunfire. Shortly thereafter, several other police officers joined the chase. Orr testified that at one point in the chase, his car collided with the Camaro, and he was able to see that the driver of the Camaro was Richard Burchfield. Orr subsequently lost sight of the Camaro, but he eventually saw that the Camaro had been driven into a lake and some other police officers had taken Goodwin into custody. Orr testified that he had seen that Goodwin was the passenger in the back seat of the Camaro.

Officer Ron Boruff of the Alcoa, Tennessee Police Department testified that he participated in the pursuit of the Camaro on December 31, 1989. When Orr left the chase, Boruff continued the pursuit. The front passenger of the Camaro fired three shots at Boruff. Boruff continued pursuit until the Camaro drove into a shallow lake. The driver and the front passenger got out of the Camaro and ran away, but Goodwin fell as he attempted to run and he was apprehended by Boruff and another officer.

Sandra Norton testified that Goodwin, Burchfield, and Appellant were all at her house on December 31, 1989. The three men arrived at Norton's house at approximately 6:00 or 6:30 p.m. and they left approximately one hour later.

-4-

Norton was not sure whether the three men all left in the same vehicle, but she knew that at least one of them drove away in a dark Camaro.

Richard Burchfield testified that he had been drinking heavily all day on December 31, 1989. Burchfield testified that although he had pled guilty to the robbery of the Smoky View Market and to aggravated assault, he could not remember going into the market and he could not remember who had entered the market with him. Burchfield testified that he had been driving the Camaro when it went into the lake, but he could not remember who else was in the car with him when it went into the lake. He assumed that Goodwin and Appellant were with him because that is what he had been told. Burchfield could not remember whether he had fired any shots during the police chase, but he did not think that he had. Burchfield also testified that he turned himself in to the police the next day.

Larry Goodwin testified that he met Appellant and Burchfield at the place where Burchfield was living on December 31, 1989. Later that evening, the three men went to the Smoky View Market. Goodwin testified that he drove the Camaro to the market, Burchfield sat in the front passenger seat, and Appellant sat in the back seat. When they reached the store, Goodwin stayed in the car while Appellant and Burchfield went in. When the two men came out of the market, Burchfield got in the front passenger seat and Appellant got in the back. Goodwin then drove away.

Goodwin testified that shortly after he drove away from the Smoky View Market, Burchfield told him to stop the vehicle. Burchfield got in the driver's seat, Goodwin got in the back seat, and Appellant got in the front passenger seat. When a police vehicle began pursuit, Appellant leaned out of the front passenger window and began shooting at the police vehicle with a rifle and then with a pistol.

Goodwin testified that after he was caught, he had initially lied to the police about the events surrounding the robbery and subsequent chase. Goodwin also testified that he had given several different accounts of the events. However, Goodwin testified that he was telling the truth at trial.

Deputy Marshall Ronald Donelson of the United States Department of Justice testified that he arrested Appellant in Greenville, South Carolina, on April 24, 1995. When the prosecutor asked Donelson why he had arrested Appellant, Donelson responded, "Mr. Dotson was arrested on the basis of a federal parole violation warrant." Defense counsel then requested a bench conference during which he objected to Donelson's statement, requested a curative instruction, and moved for a mistrial. The trial court told defense counsel it would consider the motion for a mistrial and the court gave the prosecutor specific instructions about how to question Donelson. After a series of questions, the prosecutor asked Donelson whether Appellant was arrested on a fugitive warrant from Tennessee for flight to avoid prosecution for the charges at issue in this case. Donelson then stated, "That's another reason, yes, sir." Defense counsel then requested

another bench conference during which he again moved for a mistrial because Donelson had "just reinforced what he said earlier." The trial court stated that it would consider the matter later, and the prosecutor continued with Donelson's direct examination. At the beginning of trial the next day, the trial court instructed the jury as follows:

> Yesterday, you heard testimony, one of the last witnesses, a Deputy U.S. Marshall, Ron Donelson. You're instructed to disregard the statement by Mr. Donelson that the Defendant, Mr. Dotson, was arrested in South Carolina on federal process, and you shall not consider that part of his testimony for any purpose at all.

Although the record is not entirely clear, this instruction was apparently given approximately eighteen hours after Donelson's testimony.

## ANALYSIS

Appellant contends that the trial court should have granted his request for a mistrial after Donelson testified that Appellant had been arrested for a federal parole violation. Specifically, Appellant contends that he was prejudiced by Donelson's testimony because it informed the jury that Appellant had been convicted of some unknown federal crime in the past and created the impression that Appellant had violated his federal parole by committing the offenses for which he was charged in this case. Appellant also contends that when Donelson testified that the Tennessee fugitive warrant was "another reason" that Appellant had been arrested, this reinforced the testimony about the federal parole violation and also created the impression that Appellant was facing other charges besides those in this case. Appellant places great emphasis on the fact that the trial court

-7-

failed to give a curative instruction until approximately eighteen hours after Donelson's improper testimony.[1]

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This Court will not disturb that decision absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (citation omitted).

There is no question that Donelson's testimony about Appellant's federal parole violation was improper. This testimony obviously had no relevance to any issue in the case and was clearly prejudicial. Donelson's testimony informed the jury that Appellant had previously been convicted of a federal crime and created the impression that Appellant had violated his federal parole by committing the

---

[1] We note that Appellant does not contend that the prosecutor intentionally elicited the objectionable testimony from Donelson or acted improperly in any other manner in connection with this testimony. In fact, defense counsel expressly stated during the hearing on Appellant's motion for a new trial that the prosecutor had never acted improperly in regard to Donelson's testimony.

offenses for which he was charged in this case. In addition, Donelson's subsequent testimony that the Tennessee fugitive warrant was "another reason" that Appellant was arrested served to emphasize the testimony about Appellant's federal parole violation. Of course, even though Donelson's testimony about Appellant's federal parole violation was clearly inadmissible and was clearly prejudicial, a mistrial was only required if the error created a "manifest necessity" for a mistrial.

We have examined numerous cases in which the failure to grant a mistrial has been upheld on appeal. While Tennessee Courts do not apply any rigid test when examining the failure to grant a mistrial after a witness has given improper testimony, there are certain factors that are often considered: (1) whether the improper testimony was elicited by the State or whether it was a spontaneous declaration by the witness, (2) whether the case against the defendant was strong or weak, and (3) whether the trial court gave a prompt curative instruction.[2] See, e.g., State v. Hall, 976 S.W.2d 121, 147–48 (Tenn. 1998) (holding that improper testimony about defendant's prior crime did not create a manifest necessity for a mistrial because trial court gave an immediate curative instruction); State v. Mathis, 969 S.W.2d 418, 422 (Tenn. Crim. App. 1997) (holding that improper testimony did not create a manifest necessity for a mistrial because trial court gave a prompt curative instruction); State v. Hall, 947 S.W.2d 181, 184 (Tenn. Crim. App. 1997) (holding that improper testimony about

---

[2]We note that these three factors are by no means the only factors which are relevant to a determination of whether the trial court properly refused to grant a mistrial nor is it necessary to examine these factors in every unique case. Rather, these are three factors which are often examined in cases such as this one, and we conclude that they are especially important in this case.

defendant's prior incarceration did not create a manifest necessity for a mistrial because trial court gave a prompt curative instruction); State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996) (holding that improper testimony about defendant's prior crime did not create a manifest necessity for a mistrial because the evidence of defendant's guilt was overwhelming); Williams, 929 S.W.2d at 388 (holding that improper testimony about defendant's prior bad acts did not create a manifest necessity for a mistrial because trial court gave an immediate curative instruction); State v. Dick, 872 S.W.2d 938, 944 (Tenn. Crim. App. 1993) (holding that improper testimony did not create a manifest necessity for a mistrial because the evidence against the defendant was strong and the trial court gave an immediate curative instruction); Millbrooks, 819 S.W.2d at 443 (holding that improper testimony did not create a manifest necessity for a mistrial because trial court gave a prompt curative instruction); State v. David T. Jones, No. 01C01-9710-CC-00445, 1998 WL 917810, at *2 (Tenn. Crim. App., Nashville, Dec. 21, 1998) (holding that improper testimony did not create a manifest necessity for a mistrial because the testimony was wholly unsolicited, there was overwhelming evidence of guilt, and the trial court gave an immediate curative instruction); State v. Bill Sandel, No. 03C01-9606-CC-00237, 1998 WL 28260, at *3 (Tenn. Crim. App., Knoxville, Jan. 26, 1998) (holding that improper testimony about defendant's prior criminal acts did not create a manifest necessity for a mistrial because the testimony was spontaneous and nonresponsive and the trial court gave a proper curative instruction); State v. Grover Livesay, No. 03C01-9510-CC-00298, 1996 WL 578499, at *3–4 (Tenn. Crim. App., Knoxville, Oct 9, 1996) (holding that improper testimony did not create a manifest necessity for a mistrial

because the testimony was unresponsive and the trial court gave an immediate curative instruction).

Initially, we note that contrary to the State's assertions, the prosecutor in this case is not entirely blameless for Donelson's improper statements. We agree with the State that there is nothing in the record which indicates that the prosecutor intentionally elicited Donelson's statement that Appellant had been arrested for a federal parole violation. In fact, it appears from the record that the prosecutor did not expect Donelson to refer to the federal parole violation. However, Donelson's response was hardly unforeseeable. Indeed, it is reasonable to assume that when a United States deputy marshall who has arrested a person because of a federal parole violation is asked why he arrested that person, the deputy marshall would likely respond that he arrested the person for a federal parole violation. The prosecutor should have foreseen that his question about why Appellant was arrested invited exactly the kind of response that Donelson gave.

Second, we note that the evidence of Appellant's guilt was far from overwhelming. Although several witnesses testified that one of the masked men who committed the armed robbery and subsequently fled the police in the Camaro had physical characteristics that were generally consistent with those of Appellant, Goodwin was the only witness who ever positively identified Appellant as one of the perpetrators of the crimes at issue in this case. Further, Goodwin expressly admitted that he had been untruthful in several of the statements he

had given the police in regard to the armed robbery and subsequent police chase. Goodwin testified that in his initial interview with the police, he had lied about several aspects of the robbery and car chase and had also withheld information about his two accomplices. Goodwin also testified that he subsequently gave the police as many different stories about the events in question as he possibly could. Goodwin testified that in addition to lying to the police, he had also lied to other people about the events at issue in this case. In addition, Goodwin testified that his criminal record consisted of approximately twenty-seven felony convictions.

Third, we note that the trial court did not give a curative instruction until the day after Donelson had testified, and although the record is not entirely clear, the instruction was apparently not given until approximately eighteen hours after the improper testimony. We agree with the State that there is no per se rule that a curative instruction must be given immediately in order to be effective. However, as indicated by the authorities cited above, the vast majority of cases in which Tennessee Courts have upheld a trial court's failure to grant a mistrial in situations similar to the one in this case have based that determination at least partly on the fact that a curative instruction was given immediately or at least shortly after the improper testimony. We conclude that in this case, the trial court's failure to give a prompt curative instruction after Donelson referred to Appellant's federal parole violation and subsequently reinforced that testimony was especially prejudicial. The general rule is that the jury is presumed to follow the trial court's instruction not to consider the improper testimony. See Mathis,

969 S.W.2d at 422. However, because the trial court did not give the curative instruction until the day after Donelson made the improper statements, the jury had a minimum of approximately eighteen hours during which they were free to consider the fact that Appellant had been arrested for a federal parole violation. It is clear that Donelson's improper testimony created the need for a prompt curative instruction in order to prevent unfair prejudice to Appellant, and in fact, the prosecutor expressly agreed with defense counsel that Donelson's improper testimony required a prompt curative instruction.[3]

We conclude that in this case, Donelson's improper testimony about Appellant's federal parole violation created a "manifest necessity" for a mistrial because the trial court's failure to give a curative instruction until approximately eighteen hours after the improper testimony precluded an impartial verdict. It has not escaped our notice that the jury in Appellant's first trial was unable to reach a verdict on the charges for attempted second degree murder, aggravated robbery, and all lesser included offenses.[4] While we do not have the transcript of the first trial before us, we presume that Donelson did not testify about Appellant's federal parole violation in the first trial. If Donelson did not testify about Appellant's federal parole violation in the first trial, then Appellant's argument that he was unfairly prejudiced by the improper testimony in the second trial is strengthened even more. If Donelson did give the improper testimony in

---

[3]The record indicates that after objecting to Donelson's reference to Appellant's federal parole violation, defense counsel stated that he believed the trial court should "instruct the Jury to disregard what [Donelson] just said." The prosecutor then stated, "Yeah, I think you better."

[4]The record indicates that for the charge of attempted second degree murder, seven jurors voted for guilty and five jurors voted for not guilty. For the charge of aggravated robbery, nine jurors voted for guilty and three jurors voted for not guilty.

the first trial, the prosecutor's failure to prevent this error from happening again in the second trial is inexcusable.

Accordingly, the judgment of the trial court is REVERSED and this case is REMANDED for a new trial.

_____
JERRY L. SMITH, JUDGE


CONCUR:


_____
GARY R. WADE, PRESIDING JUDGE


_____
L. T. LAFFERTY, SENIOR JUDGE