IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

APRIL 1999 SESSION

FILED

August 3, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. No. 02C01-9810-CC-00316 |
| Appellee, | ) | |
| | ) | Chester County |
| v. | ) | |
| | ) | Honorable J. Franklin Murchison, Judge |
| ISAAC MILHOLEN, | ) | |
| | ) | (Rape of a Child, Incest) |
| Appellant. | ) | |


FOR THE APPELLANT:

**PATRICK F. MARTIN**
Hardee, Martin, Jaynes, & Ivy
213 East Lafayette Street
Jackson, TN 38301
(At Trial and On Appeal)

**DAVID H. CRICHTON**
111 West Market Street
P. O. Box 651
Bolivar, TN 38008-0651
(At Trial)

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**R. STEPHEN JOBE**
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

**JERRY G. WOODALL**
District Attorney General

**LAWRENCE E. NICOLA**
Assistant District Attorney General
225 Martin Luther King Drive
P. O. Box 2825
Jackson, TN 38302-2825


OPINION FILED: _____


AFFIRMED


L. T. LAFFERTY, SENIOR JUDGE

# O P I N I O N

The appellant, Isaac Milholen, referred herein as "the defendant," appeals as of right from the judgment of the Madison County Criminal Court. In November of 1997 a Madison County jury found the defendant guilty of rape of a child and incest. The trial court, at the conclusion of a sentencing hearing, imposed a sentence of twenty-three years for rape of child, and eight years, as a Range II multiple offender for incest. The sentences were to run concurrently in the Department of Correction. The defendant presents seven (7) appellate issues:

1. Whether the defendant was denied due process in violation of his Fifth Amendment right under the United States Constitution, Article 1, Section 8, in that no charge of range of punishment was provided to the jury and the jury lacked sufficient information that would have affected its verdict.

2. Whether the trial court committed error of prejudicial dimensions by failing to grant a mistrial regarding the improper testimony of the witness, Tuten, as to other occasions of sexual abuse.

3. Whether the trial court committed error of prejudicial dimensions by failing to grant a mistrial on its own motion when trial counsel brought out on cross-examination the victim had told her grandmother the defendant had raped her.

4. Whether the trial court committed error of prejudicial dimensions by admitting medical proof of Dr. Ramer because he was not sufficiently qualified as an expert on pelvic examinations of children.

5. Whether the trial court committed error of prejudicial dimensions by ignoring the jury's announcement of being unable to reach a verdict and also sua sponte asking the jury if further deliberations were warranted.

6. Whether the trial court committed error of prejudicial dimensions by failing to dismiss the defendant's convictions as the evidence is insufficient as a matter of law to sustain a conviction for the offenses of child rape and incest.

7. Whether the trial court committed error of prejudicial dimensions by failing to grant defendant's motion for a new trial.

After a review of the entire record, briefs of the parties, and the applicable law, we affirm the trial court's judgment.

# FACTUAL BACKGROUND

T.M.,[1] age 11, testified, that in November 1996, she was 10 years old and lived with her father and stepmother in Miflin, Chester County, Tennessee. She attended East Chester Elementary School, but now lives in Henderson County with her grandmother. T.M. testified she was not in school on Friday, November 15, 1996, but played with her friend, Tina, most of the day. Her father, who worked in Jackson, called and told T.M. he was going to pick her up. When they got home, TM made some tea. Her father went into the bedroom and took a shower. TM returned to the living room and watched "Standby the Bell" on TV. While she was watching TV, her father came in the living room with a towel on. Her father put an x-rated movie in the VCR. TM went into the kitchen for more tea. When TM returned to the living room, her father came over to her while she was on the love seat. He sat down on the floor and told TM to get on the floor. When she did so, her father took her blue jeans, purple shirt, and underpants off. Her father took off the towel and got on top of TM. While on her back, her father put his privates in her vagina. He kept pushing it in and when he got off, her vagina was wet. When she got up, TM informed her father she was going to take a shower and her father wiped himself off with the towel. TM testified her father told her not to tell, or he would go to jail.

The next day, TM went to her grandmother's, Susan Daws's, home. That day TM played with her sister, Crystal. That night TM's mother, Jackie Smith, came by the house. TM testified she talked with her mother in the bedroom. TM was wearing a nightgown and told her mother what happened. TM showed her mother her vagina, and both began crying. TM returned to bed and fell asleep. That Sunday, TM did not feel like going to church, although her sister Crystal went. TM told her grandmother what happened and her grandmother called the police. That afternoon, TM, Crystal, and her grandmother went to the Sheriff's Department. There TM told a lady what had happened. On the following Monday, TM was examined by a doctor. TM acknowledged she is mad at her father, and

---

[1]It is the policy of this Court not to identify minor victims of sexual abuse. The victim will be referred to by her initials.

he is the only one who had sex with her. During cross-examination, TM testified she spends every other weekend with her grandmother and denied she told her father that she wanted custody changed to her grandmother. TM did not recall attending a parent/teacher conference on the previous Friday with her father and stepmother, Serena. TM testified, that after her mother left, she did not tell her grandmother what happened, although her grandmother asked her why she was crying.

Jackie Smith, mother of TM, testified on November 16, 1996 (Saturday), she stopped by her mother's home. It was about 10:00 to 11:00 p.m.. Her daughter, TM, was crying, but refused to talk around her grandmother and others, so Ms. Smith took her daughter into the bedroom. TM raised up her nightgown and showed Ms. Smith her vagina, which was red. The next day, Ms. Smith saw the defendant, and he said "that she wasn't going to get away with this" (meaning that Ms. Smith's mother was not going to keep TM). During cross-examination, Ms. Smith testified her mother obtained custody of TM at age two, but at age eight, the defendant obtained custody. In this time span, Ms. Smith has seen TM only three times. Although she was upset, Ms. Smith testified she did not tell her mother about the conversation with TM, because she was not "thinking straight."

Jerry Tuten, Department of Children's Services, testified she interviewed TM on November 17, 1996, regarding a complaint of sexual abuse. Ms. Tuten testified she referred the case to Department of Children's Services Investigator, Bill Austin. During the interview with TM, Mrs. Susan Daws, TM's grandmother, assisted TM in making her statement by helping with dates and custody questions. Ms. Tuten testified that she was reluctant to send TM to the emergency room for an examination "due to a weekend doctor [who] may not be experienced or willing to document the abuse."

William S. Austin, Investigator for the Department of Children's Services, testified he interviewed TM on November 18, 1996. TM was referred to Dr. Warren Ramer, Jr., in Lexington, Tennessee, for an examination. Mr. Austin described TM as depressive and embarrassed.

4

Mrs. Susan Daws, TM's grandmother, testified she has had custody of TM since November 1996. Prior to that time, the defendant had custody. Mrs. Daws had visitation rights every other weekend. On Saturday, November 16, 1996, TM arrived and was to stay until Sunday. Mrs. Daws testified that her daughter, Jackie Smith, arrived Saturday night, while TM was in bed. TM came out of the bedroom, and both went back into the bedroom. The next morning Crystal went to Sunday School, but TM did not want to go, which was unusual. TM told her grandmother what had happened, and Mrs. Daws called the Sheriff's Department. Mrs. Daws took TM to the Sheriff's Department, where they talked to a lady. On Monday, she and TM talked to Bill Austin, and Mrs. Daws took TM to a doctor. During cross-examination, Mrs. Daws testified that when TM arrived that Saturday, she appeared normal. TM and Crystal played most of the day. Mrs. Daws denied she called her daughter, Jackie Smith, that Saturday night. Mrs. Daws testified that when she saw TM and her daughter crying, she knew something was wrong but did not question them, thinking it was personal.

Dr. Warren Ramer, Jr., family physician for twenty-seven years, testified that he had a lot of pediatric and obstetrics experience. On November 18, 1996, Dr. Ramer conducted a pelvic examination of TM at the request of the Department of Children's Services. Dr. Ramer, using an adult speculum, found TM's vaginal orifice very large, which is highly irregular in a 10-year-old. TM's hymen was dilated. Dr. Ramer believed TM had been sexually penetrated. During his examination, Dr. Ramer did not see any tears, bruises, or evidence of bleeding in the vaginal area.

On November 22, 1996, Mr. Jack Wilson, Criminal Investigator for the District Attorney General's Office, testified he interviewed the defendant at the request of the Department of Human Services. The defendant had agreed to come in and discuss the allegations. Investigator Wilson advised the defendant that he was not under arrest or in custody and under any obligation to answer any questions. Investigator Wilson advised the defendant that there might be a question about whether his daughter was pregnant. The defendant responded, "I hope she is pregnant because I had a vasectomy in 1988."

5

The defendant denied he raped his daughter.

Mrs. Serena Milholen, wife of the defendant, testified that when she got home from work, TM wanted to go out to eat. TM was dressed to go out. Mrs. Milholen testified she and her husband, with TM, went to a parent/teacher conference, and then ate out. TM appeared normal and made no complaints about the event. After they ate, Mrs. Milholen and her husband took TM to her grandmother's for the weekend. Mrs. Milholen denied that TM went to her grandmother's on Saturday and denied she and her husband had x-rated movies in their home.

Ms. Diane Ivory, a teacher at Chester County Middle School, testified she attended a parent/teacher conference with TM's father and his wife. TM was present at the conference. They talked for about twenty minutes, and the defendant appeared normal and without any indication of nervousness.

Crystal Milholen, age 12, testified she recalled her sister, TM, moving back in her grandmother's home and going to the Sheriff's Department. Crystal recalled her sister came over Friday night and described her sister as not being happy or acting like herself. That Sunday, Crystal testified she and TM went to church, but then stated TM and her grandmother got her from church. Crystal did not recall seeing her mother on Saturday night. TM started crying on Sunday, when it was time for her father to pick her up.

The defendant elected not to testify.

## LEGAL ANALYSIS

## PART A
### SUFFICIENCY OF EVIDENCE

The defendant contends that, as a matter of law, the evidence does not support his

convictions. The State strongly disagrees.

When reviewing a trial court's judgment, the appellate court will not disturb a verdict of guilty unless the facts in the record and inferences which may be drawn from it are insufficient as a matter of law for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Tenn. R. App. P. 13 (e); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982); *State v. Brewer,* 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). Initially, a defendant is cloaked with the presumption of innocence. *Tuggle,* 639 S.W.2d at 914. However, a jury conviction removes the presumption of innocence and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. *Id.* In determining the sufficiency of evidence, this Court does not reweigh or reevaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). It is the appellate court's duty to affirm the conviction if the evidence viewed under these standards was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn. 1994). This rule is applicable to findings of guilt predicated upon the direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

In order to obtain a conviction for rape of a child and incest, the State is required to prove that the defendant had unlawful sexual penetration of a victim, who is less than thirteen (13) years of age. Tenn. Code Ann. § 39-13-522. For the offense of incest, the State must prove the defendant had sexual penetration with a person, knowing such person was the person's child. Tenn. Code Ann. § 39-15-302. A person acts knowingly with respect to result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b).

7

The proof at trial established that the child, TM, was picked up by her father on November 15, 1996, and taken home. After taking a shower, the defendant removed his daughter's clothes and engaged in sexual penetration of his daughter. On Saturday night, TM told her mother what had happened, and the mother, in examining her daughter, found her vagina red.[2] The child's version was corroborated by the testimony of Dr. Ramer, who found the child's vaginal orifice as large as an adult's, which is unusual in a 10-year-old child. Dr. Ramer's medical opinion was that the child had been sexually penetrated. The convicting jury was entitled to give what weight they wished regarding the defendant's statement to Investigator Wilson about his daughter's possible pregnancy and his vasectomy. Any inconsistencies in the testimony of the State's witnesses were a matter for the jury to resolve. *State v. Pappas,* 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Accordingly, we find the evidence more than sufficient to support the defendant's convictions for rape of a child and incest. This issue is without merit.

## PART B

## RANGE OF PUNISHMENT

The defendant contends that he was denied due process in that no charge on the range of punishment was provided to the jury. The defendant argues that this failure was so serious so as to deprive him of the assistance of effective counsel. The State contends the defendant did not request that the jury be charged on the applicable range of punishment, and, thus, the defendant is actually challenging the effectiveness of trial counsel's performance.

The record clearly establishes that the defendant did not file a request for the jury to be informed of the range of punishment for rape of a child, incest, or any included offenses. Pursuant to the Tennessee Criminal Sentencing Reform Act of 1989, either the defendant or the State could request the trial court to charge the jury on the range of

---

[2]It is puzzling and baffling as to why the natural mother did not tell her mother of what she had seen, nor insist on taking the child to doctor, nor tell her mother what the child had said.

punishment for a criminal offense:

> In all contested criminal cases, except for capital crimes which are governed by the procedures contained in Tenn. Code Ann. § 39-13-204 and 39-13-205, upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses. Tenn. Code Ann. § 40-35-201(b)(1) (Repealed).

If trial counsel made errors, it is the burden of the defendant to establish counsel was not functioning as guaranteed under the Sixth Amendment, and the deficient representation prejudiced the defendant resulting in a failure to produce a reliable result. *Strickland v. Washington,* 466 U.S. 667, 687, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); *Cooper v. State,* 849 S.W.2d 744, 747 (Tenn. 1993). The defendant has presented no evidence whatsoever as to why trial counsel elected not to request a range of punishment instruction. Thus, when reviewing trial counsel's actions, this Court will not use the benefit of hindsight to second guess trial strategy and to criticize trial counsel's tactics. *State v. Hellard,* 629 S.W.2d 4, 9 (Tenn. 1982). We find there is no merit to this issue.

## PART C

### FAILURE TO GRANT MISTRIAL

The defendant contends he is entitled to a new trial when a State's witness indicated that the alleged sexual misconduct was but one in a series of such instances. Thus, the trial court erred in refusing to grant a mistrial. The State argues the trial court was not in error for failing to grant a mistrial.

This alleged error occurred during the testimony of Jerry Tuten, Investigator for the Department of Children's Services. When Ms. Tuten interviewed TM on Sunday, November 17, 1996, she elected not to request a medical examination of the victim. Ms. Tuten expressed her concerns over weekend doctors in an emergency room not substantiating sexual abuse cases, so she referred the case to a fellow investigator, Bill Austin. In redirect examination, the State attempted to elicit from Ms. Tuten why TM could

9

wait one day to see a regular physician:

> Q. And the incident of child sexual abuse -- you were able to ascertain from talking to [TM] where this was supposed to have occurred; is that correct?
>
> A. Yes, sir. She made a statement about that.
>
> Q. And what was the date?
>
> Mr. Crichton: Objection, Your Honor. That calls for hearsay from [TM].
>
> Mr. Nicola: Your Honor, this is in response to what--
>
> The Court: What was your question?
>
> Mr. Nicola: What date that [TM] gave as the date of the incident. He got into it about when it occurred and why they waited to see the doctor, and I believe that goes into her judgment of why she testified it was not a medical emergency because it hadn't happened that day, and that's why--
>
> The Court: Objection overruled. I think in view of what's come up here, it might be significant as to what she understood about the date of the incident.
>
> Q. When did you understand the date of the incident to be?
>
> A. She alleged that the most recent incident was on Friday the 15th -- Friday afternoon.
>
> Mr. Crichton: Your Honor, may we approach.

Prior to the motion for a mistrial, the trial court expressed its concern in that it wished the witness had not said "the most recent incident," but found it was not the State's fault nor the witness's. The witness had gone through an extensive cross-examination about the lack of medical attention, and in the witness's mind, the reason for the non-examination had to do with the history of what happened. The trial court denied the defendant's motion for a mistrial and offered a curative instruction to the jury. Reluctantly, the defendant agreed to the curative instruction. The trial court gave a curative instruction to the jury, "that there is only one incident involved in this case, and that is the alleged incident of November the 15th, and there is only one incident that's charged against Mr. Milholen. I want to make that clear to you."

First, we note the indictment alleges only one incident of sexual penetration, occurring on November 15, 1996. Thus, we are not confronted with accusations of sexual misconduct within a time period. It is well established in Tennessee that there is no sex crime's exception to the general rule that evidence of other crimes is admissible only if it is relevant to an issue other than the defendant's propensity to commit a crime. *State v. Dutton,* 896 S.W.2d 114, 117 (Tenn. 1995); *State v. Rickman,* 876 S.W.2d 824, 827-28 (Tenn. 1994).

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney,* 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This Court will not disturb such a ruling absent a finding of an abuse of discretion. *State v. Adkins,* 767 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams,* 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). Furthermore, we presume that the jury followed the trial court's explicit instruction not to consider the inappropriate testimony. *State v. Smith,* 893 S.W.2d 908, 923 (Tenn. 1994). The State, in an attempt to clarify Ms. Tuten's testimony as to her decision not to request a medical examination of TM, did not act in bad faith or purposely solicit the witness's response. In light of the limited nature of the offending testimony and the trial court's prompt curative instruction, we find that the trial court did not abuse its discretion in refusing to grant a mistrial. *See State v. Dick,* 872 S.W.2d 938, 944 (Tenn. Crim. App. 1993); *State v. Terry Dean Sneed,* No. 03C01-9702-CR-00076 (Tenn. Crim. App., Knoxville, November 5, 1998). There is no merit to this issue.

## PART D

### TRIAL COURT'S FAILURE TO GRANT MISTRIAL SUA SPONTE

The defendant contends the trial court's concerns over the testimony that TM had told her grandmother the defendant had raped her created a manifest necessity for the trial court on its own motion to declare a mistrial. The State counters that the defendant participated in the alleged error and is not entitled to relief.

At the conclusion of the State's redirect examination of Mrs. Susan Daws, TM's grandmother, defense counsel, in recross examination, asked the witness a number of questions surrounding TM's visit to a hospital emergency room on a prior occasion:

> Q. Now, was [TM] with you when you took her to Dr. Bratten to the Emergency Room? Did you take her?
>
> A. Yes.
>
> Q. That was for strep throat?
>
> A. Right. She was smaller.
>
> Q. So you took [TM] to the Emergency Room for strep throat, but you don't take her to the Emergency Room after an allegation of rape by her own father? Would that be fair to say?
>
> A. Well, this was on a Sunday, and I didn't figure a doctor would -- I thought she was supposed to see a regular doctor about something like that.
>
> Q. How many kids do you have, Ms. Daws?
>
> A. I have three grown kids.
>
> Q. Three grown kids? And you don't think -- you don't think -- you were going to wait to go to a regular doctor after your own granddaughter had made an allegation of rape by her own father -- is that what your testimony is? You would rather her see a regular doctor?

At this point, the trial court requested the attorneys to approach the bench. It is clear the trial court was concerned that defense counsel solicited testimony that the child had told her grandmother about the rape allegation. The trial court suggested that defense counsel abandon any further questions along that line, which counsel agreed.

The defendant cites *State v. Carter,* 890 S.W.2d 449 (Tenn. Crim. App. 1994) as authority. In *Carter,* the trial court was faced with a series of complex problems. This was a death penalty case in which the jury had been sequestered. After hearing some testimony, the State suddenly found a newly discovered witness, Sneed, who was in the Shelby County Jail. Compounding the problem was another witness, Carrick, who had possession of a .380 caliber pistol, which was the murder weapon. Carter was represented by the Public Defender, whose office also represented both Sneed and Carrick. Defense

12

counsel for Carter found newly discovered alibi witnesses. To further exasperate problems, a bomb threat occurred to the building. As a result, the trial court, *sua sponte*, declared a mistrial in the interest of justice.

The decision by a trial court to grant a mistrial, *sua sponte,* lies within the sound discretion of the trial judge. *State v. Seay,* 945 S.W.2d 755, 764 (Tenn. Crim. App.), *per app. denied* (Tenn. 1996). The trial court's decision will not be overturned on appeal unless there was an abuse of discretion. *Id.* A mistrial is only appropriate in a criminal case where there is a "manifest necessity." *Arnold v. State,* 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977), *cert. denied* (Tenn. 1978). In determining when a trial judge should declare a mistrial, *sua sponte,* no abstract formula can be mechanically applied, and all the facts and circumstances should be taken into consideration. *Jones v. State,* 218 Tenn. 378, 403 S.W.2d 750, 754 (1966).

Applying the foregoing discussion to the facts in this case, we are convinced that the trial court was not in error for failing to declare a mistrial on its own motion. First, we note that the trial court cautioned defense counsel about the possibility of exploring further the statements made by TM to her grandmother. Counsel agreed to withdraw this line of questioning. Second, TM testified she told both her mother and grandmother what had happened between her and the defendant. Although the exact statements made by TM were not related through these State witnesses, the jury was aware TM had told her mother and grandmother about the event. We find no merit to this issue.

## PART E
## MEDICAL PROOF

The defendant contends that Dr. Warren Ramer, Jr., was not sufficiently qualified to testify as an expert on pelvic examinations, and, thus his testimony was erroneously admitted. The State counters that this issue has been waived, in that the defendant did not object to this testimony.

13

Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In permitting expert testimony, the qualifications of expert witnesses, and the relevancy and competencies of expert testimony are matters that lie within the sound discretion of the trial court. A trial court's decision on these matters will not be reversed upon an appeal absent a clear showing of abuse of discretion. *State v. Davis,* 872 S.W.2d 950, 955 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1995); *State v. Rhodes,* 739 S.W.2d 6, 13, (Tenn. Crim. App.), *per app. denied* (Tenn. 1987). The record establishes that the defendant did not object to the medical testimony of Dr. Ramer, but did raise this issue in his motion for a new trial. Ordinarily, failure to make a contemporaneous objection waives consideration by this Court of the issue on appeal. *See* Tenn. R. App. P. 36(a); *Teague v. State,* 772 S.W.2d 915, 926 (Tenn. Crim. App. 1988), *per. app. denied* (Tenn. 1989); *State v. Killebrew,* 760 S.W.2d 228, 235 (Tenn. Crim. App.), *per. app. denied* (Tenn. 1988). Even if this issue was not waived, we fail to find from our review of the record that the defendant was prejudiced by the admission of Dr. Ramer's testimony. It is clear from the record that Dr. Ramer had a long history of family practice with much experience in pediatrics and obstetrics. Although Dr. Ramer has done many pelvic examinations of patients, he admitted he had not done many on children. Dr. Ramer agreed he had not examined TM's pelvic area before, but it is obvious Dr. Ramer was surprised to find TM's vaginal orifice the size of an adult's. There is no merit to this issue.

## PART F

## JURY'S ABILITY TO REACH A VERDICT

The defendant argues that the trial court unduly protracted the jury's deliberations by *sua sponte* inquiring of the jury if they believed further deliberations would produce a verdict. The State counters that the trial court did not abuse its discretion in inquiring if the

14

jury needed further time to deliberate on its verdict.

The record establishes that the jury instructions were completed by the trial court at approximately 10:16 a.m., and the jury retired to consider their verdict at approximately 10:17 a.m. At 4:10 p.m., the jury reported they had a question. The exact question submitted by the jury is not contained in the record. The following colloquy occurred between the trial court and the jury:

> The Court: All right. We have the jury here. Do you think that further deliberations will -- can result in a verdict?
>
> How about you? You are a military man, Mr. Kerstter?
>
> Mr. Kerstter: At this point in time, no.
>
> The Court: You have a doubt that you will ever reach a verdict in this case. Do you doubt this?
>
> Mr. Kerstter: Yes, your Honor.
>
> The Court: Does anybody else want to come out on comment on that? Does anybody else want to give their opinion?
>
> The question is -- just "yes" or "no" – do you think further deliberations will result in a unanimous verdict?
>
> A juror: I think if we work a little longer, we will be able to reach a verdict.
>
> The Court: Good enough then.
>
> A juror: I do too.
>
> The Court: Go back and work some more on it. I wish I could give you some more facts, but I just can't do it.
>
> All right. Go back and work some more on this case.

The jury retired at 4:14 p.m. to continue deliberations and at approximately 4:36 p.m., they reported their verdict.

We will infer the jury's question, at 4:10 p.m., was they may have been unable to reach a verdict. When a jury's deliberations have not produced a verdict, and it returns to the courtroom and so reports, the trial court may inquire as to the progress, and the jury may be asked whether it believes it might reach a verdict after further deliberations. If the trial court feels further deliberations might be productive, it may give supplemental

instructions to assist the jury in its deliberations. *Kersey v. State,* 525 S.W.2d 139, 141 (Tenn. 1975). Unless the trial court's actions cause a jury to reach a verdict in such manners that it is patently not their free and untrammeled verdict, a new trial will not be granted. *Rushing v. State,* 565 S.W.2d 893, 896 (Tenn. Crim. App.), *cert. denied* (Tenn. 1978); *State v. Howard Brown,* No. 03C01-9505-CR-00139 (Tenn. Crim. App., Knoxville, December 11, 1997). Although the defendant complains that the jury reached a verdict within twenty-two additional minutes, this fact in and of itself does not constitute a ground to attack the validity of the convictions. *State v. Caldwell,* 656 S.W.2d 894, 897 (Tenn. Crim. App. 1983). We find the trial court did not abuse its sound discretion in questioning the jury as to the need for further deliberations. This issue has no merit.

## PART G
## FAILURE OF TRIAL COURT TO GRANT A NEW TRIAL

The defendant contends the trial court failed to properly weigh the evidence and grant a new trial pursuant to Rule 33(f), Tenn. R. Crim. P. The State counters that the defendant has waived this issue for failure to cite in the record or articulate any specific reason why the evidence is insufficient to support his convictions.

The defendant has not submitted a transcript, for the purpose of an appeal, of the hearing on the merits of the motion for a new trial submitted to the trial court. Rule 33(f), Tenn. R. Crim. P., states that "the trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Thus, the trial court, acting as the thirteenth juror, must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict. *State v. Carter,* 890 S.W.2d 119, 122 (Tenn. 1995). When a trial court overrules a motion for a new trial, this Court may presume that the trial court has served as the thirteenth juror and approved the jury's verdict. *State v. Blanton,* 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). From our review of the entire record, the evidence fully supports the defendant's convictions.

The trial court's judgment is affirmed.

_____
L. T. LAFFERTY, SENIOR JUDGE

CONCUR:

_____
JOSEPH M. TIPTON, JUDGE

_____
DAVID G. HAYES, JUDGE