# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 19, 2014 Session

## STATE OF TENNESSEE v. LONTA MONTRELL BURRESS, JR., AND DARIUS JEREL GUSTUS

**Appeal from the Criminal Court for Hamilton County**
**Nos. 279579, 279580, 279581, 279605    Honorable Don W. Poole, Judge**

---

**No. E2013-01697-CCA-R3-CD - Filed December 4, 2014**

---

The Defendant-Appellant, Lonta Montrell Burress, Jr., was convicted as charged by a Hamilton County jury of three counts of aggravated assault, one count of possession of a deadly weapon during the commission of an offense not defined as a dangerous offense, one count of theft of property, one count of felony evading arrest, and one count of misdemeanor evading arrest.[1]  The trial court sentenced Burress to an effective sentence of six years.  The other Defendant-Appellant, Darius Jerel Gustus, who was tried jointly with Burress, was convicted as charged of three counts of aggravated assault, one count of possession of a deadly weapon during the commission of an offense not defined as a dangerous offense, one count of felony reckless endangerment, and one count of misdemeanor evading arrest.  The trial court also sentenced Gustus to an effective sentence of six years.  On appeal, Burress argues:  (1) the evidence is insufficient to sustain his aggravated assault convictions and his theft conviction; (2) the trial court erred in denying a mistrial based on the admission of gang testimony; (3) the trial court erred in denying a mistrial based on a <u>Bruton</u> violation; and (4) the trial court erred in determining that LaJuana Woods was an unavailable witness pursuant to Tennessee Rule of Evidence 804 and erred in allowing the State to have Woods read her testimony from the juvenile court transfer hearing transcript at trial.  On appeal, Gustus contends: (1) the evidence is insufficient to sustain his aggravated assault conviction regarding victim Frederick Jones, Jr.; (2) the trial court erred in denying a mistrial based on the admission of gang testimony; and (3) the trial court erred in admitting two bandanas because there was an improper chain of custody.  Upon review, we affirm the judgments of the trial court.

---

[1]  Prior to trial, the State dismissed charges against Burress for leaving the scene of an accident and reckless driving.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and ROBERT L. JONES, SP. J., joined.

John G. McDougal, Chattanooga, Tennessee, for Defendant-Appellant, Lonta Montrell Burress, Jr., and Galen P. Pickard, Chattanooga, Tennessee, for the Defendant-Appellant, Darius Jerel Gustus.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Cameron B. Williams and Bret Alexander, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** Rodney Billingsley, a salesman for M & J Shoes in Chattanooga, Tennessee, testified that his truck was stolen from his job on December 4, 2010. That day, he went outside and cranked his truck to warm it up at 7:15 p.m. because the shop closed at 7:30 p.m. When he returned to the store to close it for the day, he heard someone driving his truck down the road. At the time, he was not overly concerned because he thought one of his friends was playing a trick on him. Approximately fifteen minutes later, when it was time for Billingsley to leave work, he discovered that his truck had not been returned and immediately called the police to report it stolen. Billingsley[2] said he never saw the person who took his truck. However, he asserted that he did not know Lonta Burress and had never given Burress permission to take his truck.

Billingsley had purchased the truck, a red Ford F-150, six months earlier for $4500 and stated that it was in excellent condition at the time it was stolen. Three days after his truck was taken, the police notified him that it had been totaled in a wreck at Third Street.

Florida Wynn, an officer with Chattanooga Police Department, testified that on December 7, 2010, at 2:35 p.m. she was dispatched to the intersection of Through Street and Greenwood Road in Hamilton County, Tennessee. When she arrived at that location, she talked to Ronald Madden, Frederick Jones, Jr., Jamichael Eubanks, and Tramelvin Simmons, who told her that two African-American males had fired shots from a red F-150 pickup truck. Madden also told her that these two men were wearing either blue or black bandanas over

---

[2] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

their faces when the shots were fired from the truck. Officer Wynn issued a statement for other officers to be on the lookout (BOLO) for two African-American males driving a red F-150 truck.

Ronald Madden testified that on December 7, 2010, he called the police because he saw two African-American teenagers in a truck, one of whom was firing gunshots at several unarmed students at the intersection of Greenwood Road and Through Street. Madden saw a school bus stop and then saw eight or nine students exit the bus and begin walking down Through Street. At the time, a red F-150 pickup truck was parked behind the bus, and when the bus pulled away from the bus stop, the person on the passenger side of the truck hoisted himself up on the window ledge and fired with a single gun three or four shots over the truck at a group of eight or nine unarmed students. Madden said the shooter had a blue bandana covering his mouth. When the shots began, the students started running toward Through Street. The truck backed up onto Greenwood Road, and then proceeded up Through Street, and the passenger fired four or five more shots from a single gun at the fleeing students, who were by that time on the opposite side of the street. Madden said it was obvious that the shooter was aiming at a "certain individual" because when that person ran toward Through Street, the truck backed up and followed him. He said he was able to get a good look at the shooter because the shooter was on his side as the truck drove up Through Street. During the shooting incident, Madden said he "actually felt helpless" and was upset and fearful because the victims in this case could have been his own children. Madden said he called 9-1-1 during the shooting incident. After reviewing the video recording of the police chase, Madden said the red truck from the shooting incident was the same red truck involved in the police chase.

Tramelvin Simmons testified that in 2010, he attended Brainerd High School and rode the school bus every day to school. On December 7, 2010, as he was getting ready to exit the school bus, he heard ten to fifteen gunshots but could not determine their origin. He ran a long way down Through Street before taking cover behind some trees. Simmons could tell that shots were being fired behind him as he ran because the bullets were passing him and hitting homes in front of him. He said there were seven students with him who were running for cover, including his brother Frederick Jones, Jr., and another student named Jamichael Eubanks, and that they all ran in different directions when the shooting began. Simmons said that at the time of the shooting he was scared and afraid that he would be injured because he knew he was in a dangerous situation. He did not know where Jones was when the shots were fired, although he saw him exit the bus. He said Jones was walking when he first got off the bus; however, when the shooting began, everyone began running, although he did not specifically see Jones running. Simmons said Jones knew Burress and Gustus because they all attended the same high school, but he was unsure whether Jones had ever had problems with Burress or Gustus.

Justin Allen, an officer with the Chattanooga Police Department, testified that he was assigned to the crime suppression unit, which "respond[s] to shootings, major activities, crimes, gang-related activities and things of that nature." On December 7, 2010, at around 3:00 p.m., he was dispatched to the area of Greenwood Road and Through Street because shots had been fired by a passenger inside a red F-150 truck. After patrolling the area for five to ten minutes, Officer Allen found a vehicle matching that description in the 1000 block of Dodson Avenue, which was approximately two miles from the intersection of Greenwood Road and Through Street. He said the truck was traveling south on Dodson Avenue with three occupants. Officer Allen identified Burress as the individual driving the truck. He also said a male and a female were passengers in the truck. When he saw the truck, he made a U-turn and initiated a traffic stop. When Officer Allen was about to exit his patrol car, Burress drove away from the scene. Officer Allen notified dispatch that the truck had fled and began pursuing the truck. He explained the manner in which Burress tried to avoid capture:

> The vehicle turned left onto Arlington Avenue through Willow Housing Development, got down to Wilson Street where it blew a stop sign, almost causing a wreck with a vehicle, where it turned back east onto Wilson Street, ran through another stop sign at Wilson and North Chamberlain and continued traveling [at] a high rate of speed going towards Memorial Hospital where it was weaving in and out of traffic, driving erratically, went through another light, continued to travel on Greenwood . . . still driving erratically at high rates of speed and in and out of traffic, in and out of its lane, turned right onto McCallie where it blew a red light at McCallie and continued to go west on McCallie to North Willow.
>
> After that time, [Burress] was going [at] high rates of speed going around other cars, dodging traffic, and when it turned right onto North Willow, it caused a traffic accident with a red vehicle and continued to travel back on North Willow until it lost control of the vehicle after running a red light at Third Street and North Willow, hit a pole and flipped over several times.

Officer Allen stated that his entire pursuit of Burress, which occurred at approximately 3:00 p.m. in heavy traffic, lasted less than five minutes, although he reached speeds of over eighty miles per hour during the chase. He stated that his pursuit of the truck was recorded by his in-car video recording system.

Officer Allen stated that following the crash, all three occupants of the truck crawled out of the vehicle and fled on foot. He followed the suspects in his patrol car and finally exited his vehicle and followed them on foot. Officer Allen saw Burress in the alley and

ordered him to stop, but Burress ran, and Officer Allen continued to pursue him on foot. He eventually caught Burress at the corner of Cleveland Avenue and North Kelly Street. After restraining Burress, Officer Allen returned to the scene of the accident. He observed that the red truck had sustained such serious damage that it had "split in half."

Rusty Morrison, an officer with the Chattanooga Police Department, testified that he was assigned to the crime suppression unit, which was "more of a support unit for the entire department for different divisions, for either working homicides, shootings, robberies and so forth." On December 7, 2010, Officer Morrison was in his office when he overheard a call come in over the radio regarding the shots that were fired at the bus stop. He said that he did not immediately respond to this first call because there were other officers in the field. However, when he overheard Officer Allen advising dispatch that he was in pursuit of the truck that matched the description of the vehicle the suspects were driving during the shooting incident, Officer Morrison drove to the general location of the wreck. As he was in route, he learned that the truck the suspects were in had been involved in a crash and that Officer Allen had detained one of the suspects in an alley.

Officer Morrison knew there were two suspects, a male and a female, that had not yet been detained. He began looking for these two suspects in an apartment complex nearby. When he got to the front of the complex, he saw Gustus walking across Dodson Avenue. Officer Morrison said that there were several officers in the area because of the crash, and a crowd had gathered to watch what the officers were doing. Despite this chaos, Gustus walked across the road and never looked at the officers. Gustus, who was carrying an Oreo racing jacket, then walked into a recycling center. Officer Morrison immediately became suspicious of Gustus's behavior because he did not appear to be an employee at the recycling center.

When Officer Morrison pulled into the area and tried to contact Gustus, he immediately ran from him. As he pursued him, Officer Morrison identified himself multiple times as a police officer, but Gustus did not stop. Instead, Gustus ran around a dumpster before exiting the recycling center and running back across Dodson Avenue and into the apartment complex. Right before Gustus ran around a building, he dropped his jacket, and jumped over a fence. Sergeant Royval, who was on the other side of the fence, ultimately took Gustus into custody. When Officer Morrison returned to examine the jacket Gustus had dropped, he found two fully-loaded .38 caliber revolvers in the outside pockets of the jacket, and he found a medical insurance card in the name of Rodney Billingsley inside the jacket.

During an interview at the hospital, Gustus initially denied knowing anything about a shooting. Gustus said that Burress picked him up and later fled from an officer during a traffic stop. Eventually, Gustus admitted to Officer Morrison that he was involved in the

shooting. He said that he saw Frederick Jones, Jr., and when Jones displayed a weapon, he got scared and pulled out his weapon and fired it to scare Jones. Gustus acknowledged that he was sitting in the passenger seat of the truck Burress was driving when he fired his gun. When they fled the area in the truck, Gustus reloaded his gun in case he had to shoot again and tossed the spent shell casings out the window of the truck.

Jamichael Eubanks testified that he was seventeen years old, attended Brainerd High School, and regularly rode the bus to and from school. On December 7, 2010, Eubanks exited the school bus at the intersection of Greenwood Road and Through Street. He said Frederick Jones, Jr., and Tramelvin Simmons, along with some other students, got off the bus with him, and they began walking up the street when they heard several gunshots. Eubanks could not tell the origin of the shots, although he saw a red truck parked behind the bus. He was unable to see the occupants of the red truck. Eubanks said he, Jones, Simmons, and the other students all ran in different directions, although it did not appear that a particular person was the target of the gunshots. He ran to his house because he was scared that he might get shot. Eubanks said he knew Burress and Gustus from school and acknowledged that he had testified at the juvenile court transfer hearing that the gunshots had been fired at them from the red truck. Eubanks said that when he arrived home, he did not tell his mother about the shooting. He could not recall what he said to the police during his interview following the shooting. Specifically, he did not recall telling the police that Lonta Burress and two other individuals were inside the truck, that the truck had been following the bus, that he thought a shooting was about to take place, and that the passenger in the truck opened fire a short time later. He also did not remember telling the police that Jones and Burress had an ongoing dispute over a girl.

Josh May, another officer with the Chattanooga Police Department, testified that he worked in the crime suppression unit, which he stated was the "de facto gang unit within the city" that identified "gang members, ke[pt] track of them" and had "a myriad of other responsibilities." He said his unit also assisted federal agencies, helped with warrant roundups, and supported other divisions within the police department. Officer May interviewed Jamichael Eubanks at his home after the shooting. During the interview, Eubanks said that he, Frederick Jones, Jr., and Tramelvin Simmons were riding the school bus when they realized that a red pickup truck was following them. Eubanks knew something was going to happen and identified Burress as one of the people inside the truck. He explained that Burress and Jones had been fighting over a girl and that the dispute between them was getting worse. Eubanks told Officer May that the passenger in the red truck actually fired the shots from the passenger side of the vehicle.

Officer May said he was present at the crash scene when officers collected two bandanas, a light blue one and a dark blue one, from the red truck. He then identified two

bandanas at trial as the ones collected from the red truck. He stated that he was certain that these were the two bandanas he saw inside the red truck at the scene, although he did not personally see them being collected, and the court allowed them to be entered into evidence. Officer May acknowledged that bandanas like the ones in this case could have been bought in any store. He further acknowledged that he was not present when the truck wrecked and that he did not know when the bandanas were put into the truck.

James Russell Davis, II, a special agent forensic scientist with the Tennessee Bureau of Investigation, was declared an expert in the field of gunshot primer residue analysis. Agent Davis stated that the gunshot residue kits taken from Burress and Gustus were negative for gunshot residue. However, he explained that negative results did not mean that Burress and Gustus had not fired, handled, or been near a gun when it was fired. He stated that gunshot residue could be removed through activity or washing one's hands. He also said that a person could fire a gun while wearing gloves and then throw the gloves away, which could cause a negative result.

LaJuana Woods testified that she knew Burress and Gustus but did not remember anything that happened on December 7, 2010. When Woods said that she could not remember anything about a shooting incident involving a red truck on December 7, 2010, the State presented her with a copy of the transcript from the juvenile court transfer hearing to refresh her recollection. She then testified that she could not recall being picked up by Burress in a red truck on December 7, 2010. She acknowledged that she had talked to the State about this case within the last week but asserted that her answers to the State's questions during that meeting had come from the juvenile court transfer hearing transcript and not from her independent recollection of those events. At that point, the State requested that it be allowed to treat Woods as an adverse witness, which the court granted. Woods again stated she did not remember Burress picking her up in a red truck on December 7, 2010, and did not remember giving prior testimony about the December 7, 2010 incident. She denied that she was feigning memory loss because she had been threatened.

The State requested that Woods review the transcript from the prior hearing and then asked if she could remember testifying about why she left her home on December 7, 2010. When Woods said she could not recall her testimony in response to that question, the State asked her to read her answer from the transcript. She then read that Burress had picked her up. When Woods said that she no longer remembered her testimony from the prior hearing, the court told her to "[a]nswer his questions as best you can." At that point, the State asked Woods the same questions that she had been asked at the prior hearing and then had Woods read her response from the transcript. By having Woods read her responses from the prior hearing, the State was able to present evidence that Burress had picked up Woods in a red pickup truck, and she had sat between Burress, who was driving, and Gustus, who was in the

passenger seat. When Woods first got in the truck, a small gun was lying in the middle seat where she was going to sit, and she moved it to the floorboard of the truck. She said that the truck ended up behind a bus, and when some of the teenagers in the bus began staring at them, Gustus fired four shots at a boy, although she did not know the boy's name. When Gustus began shooting, the boy ran. Woods said that there were other teenagers around when Gustus started shooting at the boy and that Gustus used the gun that she moved to the floorboard of the truck. After the shooting incident, Burress drove them through the Wilcox Tunnel, and they got stopped by an officer. When the officer never got out of his patrol car, Burress drove off and wrecked the truck following a high-speed police chase. Following the wreck, Woods, Burress, and Gustus ran in different directions. After reading her prior testimony, Woods said that the transcript did not refresh her recollection about what had happened on December 7, 2010.

Woods stated that she could not remember what had occurred on December 7, 2010, because she had been hit in the head with a bat when a fight broke out at a concert in Atlanta, and her injuries to her skull required her to be hospitalized for two days. She also stated that she nearly died prior to having her child in 2011. She remembered flipping over in the truck and glass shattering, but she did not remember anything about the shooting. Although she did not remember the things she testified to at the juvenile hearing, Woods acknowledged that if her responses were in the transcript from that hearing, she probably made those statements at the time. Woods agreed that she had previously testified that Burress never fired a weapon during the incident and that neither she nor Burress were wearing a mask during the incident.

Woods admitted that she had previously testified that four shots were fired but that she could not remember if any other shots were fired or if the gun was reloaded. She also could not remember whether Gustus wore anything covering his face, although she acknowledged that she had previously testified Gustus had not worn anything to disguise himself. She said she had previously testified that Gustus stuck his hand out of the side of the truck before firing his gun. She was unable to recall whether Gustus fired his gun at one person or a crowd but acknowledged that she had testified at the transfer hearing that Gustus had shot at one person.

## ANALYSIS

**I. Sufficiency of the Evidence.** Burress argues that the evidence is insufficient to sustain his convictions for aggravated assault and theft, and Gustus contends that the evidence is insufficient to support his conviction for aggravated assault involving victim Frederick Jones, Jr. We conclude that a rational jury could have found Burress and Gustus guilty beyond a reasonable doubt of these offenses.

-8-

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

**A. Aggravated Assault Offenses Involving Jones.** Burress and Gustus, noting that Jones did not testify at trial, argue that the State presented insufficient evidence that Jones was in reasonable fear of imminent bodily injury for their respective aggravated assault convictions. Gustus specifically asserts that the only evidence showing Jones was afraid was testimony from Tramelvin Simmons and Jamichael Eubanks that Jones ran when the shots were fired. In his brief to this court, Gustus claims that there was "no proof given as to where in the vicinity Frederick Jones[,] Jr.[,] was during the shooting, how far away he was from the shooter, where the shooter [was] and in what direction the shooter was firing, whether he was being targeted, or that he even knew that a shooting was occurring outside of other children running."

Burress and Gustus were charged with intentionally or knowingly causing Frederick Jones, Jr., to reasonably fear imminent bodily injury through the use or display of a deadly weapon. See T.C.A. § 39-13-102(a)(1)(B) (2010) (amended July 1, 2011 and July 1, 2013). Aggravated assault based on fear requires the victim to have a "well-grounded apprehension of personal injury or violence." State v. Jones, 789 S.W.2d 545, 550-51 (Tenn. 1990). Circumstantial evidence is sufficient to establish a victim's fear of imminent bodily injury. State v. Jessie James Austin, No. W2001-00120- CCA-R3-CD, 2002 WL 32755555, at *5 (Tenn. Crim. App. Jan. 25, 2002) (citations omitted). "The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." State v. Gregory Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998) (citing State v. Jamie Lee Pittman, No. 03C01-9701-CR-00013, 1998 WL 128801, at *5 (Tenn. Crim. App. Mar. 24, 1998)).

A victim's fear may be inferred from circumstances surrounding the offense, even if the victim does not testify at trial. See State v. Barry Smith, No. W2011-02122-CCA-R3-CD, 2013 WL 6388588, at *14 (Tenn. Crim. App. Dec. 5, 2013) (concluding that the non-testifying victims were in reasonable fear of imminent bodily injury when witnesses testified that these victims were inside the house at the moment the defendants began shooting and that people were "hollering" and "screaming" and were trying to find a place to hide from the "bullets flying from every angle"); State v. Szumanski Stroud, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *3 (Tenn. Crim. App. Oct. 29, 2007) (holding that two non-testifying victims were in reasonable fear of imminent bodily injury when the evidence showed that they had a violent altercation with the defendant at their home, that the defendant pointed a gun at one of the victims, and that the defendant fired four or five shots at the victims inside the car); State v. Harry Jamieson, No. W2003-02666-CCA-R3-CD, 2004 WL 2996910, at *8 (Tenn. Crim. App. Dec. 23, 2004) (concluding that the non-testifying victims were in reasonable fear of imminent bodily injury when other witnesses testified that the defendant pointed his gun at the victims and that the victims were "hysterical" and "crying"); Jessie James Austin, 2002 WL 32755555, at *6 (finding that the non-testifying victim reasonably feared imminent bodily injury when a witness testified the victim was aware of the defendant's threatening statements and the defendant pointed his gun at the victim).

Gustus argues that the State presented no proof regarding Jones's location during the shooting or his proximity to the gunfire. This is essentially a zone of danger argument, which this court has specifically declined to apply in aggravated assault offenses. State v. Bobby Joe Young, Jr., No. M2010-01531-CCA-R3-CD, 2011 WL 6291813, at *8 (Tenn. Crim. App. Dec.14, 2011) (citing State v. James Paris Johnson, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at *6 (Tenn. Crim. App. Sept.15, 2010) (noting that the zone of danger

approach is applicable to reckless endangerment cases involving victims who are unaware of danger but is not applicable to aggravated assault cases based on fear because the latter offense requires that the victim have a fear or reasonable apprehension of being harmed)). Instead, the proper inquiry is whether Jones, who did not testify, had a reasonable fear of imminent bodily injury.

At trial, Officer Wynn testified that upon arriving at the scene, she talked to Ronald Madden, Frederick Jones, Jr., Jamichael Eubanks, and Tramelvin Simmons, who told her that two African-American males had fired shots from a red F-150 pickup truck. Madden himself testified that the passenger in the truck, who was wearing a blue bandana over his face, fired three or four gunshots at several unarmed teenagers who had just exited a school bus. He said that when the gunshots were fired, the teenagers scattered and ran for safety, and then the truck backed up onto Greenwood Road and drove up Through Street, where the passenger fired an additional four or five shots at a "certain individual." Madden said that he "actually felt helpless" and was upset and fearful because the victims in this case could have been his own children. Tramelvin Simmons testified that he heard ten to fifteen gunshots and ran for cover. At the time, there were seven students with him who were running in different directions for cover, including Jamichael Eubanks and Frederick Jones, Jr. Simmons further testified that he was scared and was afraid that he was going to be injured because it was a dangerous situation. Jamichael Eubanks testified that he exited the bus with Frederick Jones, Jr., and Tramelvin Simmons when they heard shots fired, and they all ran in different directions. Eubanks said he ran home because he was scared that he might get shot. Officer Morrison stated that Gustus admitted that he fired his gun during the incident to scare Jones. Officer May testified that Eubanks told him that Burress was inside the red truck and that Burress and Jones had been fighting over a girl.

In the light most favorable to the State, the evidence shows that Frederick Jones, Jr., was present at the scene of the shooting, was one of the teenagers fired upon after exiting the bus, and was running because he was fearful he might be shot during the incident. Given this proof, a rational jury could have found that Burress and Gustus intentionally or knowingly caused Frederick Jones, Jr., to reasonably fear bodily injury through the use of a deadly weapon. Therefore, we conclude the evidence is sufficient to support the aggravated assault convictions involving Jones.

**B. Aggravated Assault Convictions Under a Theory of Criminal Responsibility.** Burress also contends that the evidence is insufficient to convict him of the three aggravated assault offenses because there was no proof presented that he fired the gun or had possession of the gun during the shooting incident. We conclude the evidence is sufficient to sustain all three of his aggravated assault convictions under a theory of criminal responsibility.

For the aggravated assault offenses in this case, the State had to prove beyond a reasonable doubt that Burress intentionally or knowingly caused Tramelvin Simmons, Frederick Jones, Jr., and Jamichael Eubanks to reasonably fear imminent bodily injury through the use or display of a deadly weapon. See T.C.A. § 39-13-102(a)(1)(B) (2010). At trial, the State argued that Burress was guilty of the charged offenses under a theory of criminal responsibility. An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2) (2010). Criminal responsibility is not a distinct crime but "a theory by which the state may prove the defendant's guilt based on another person's conduct." State v. Osborne, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing State v. Mickens, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). In the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime can be inferred." State v. Watson, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." Id. (citing Ball, 973 S.W.2d at 293).

In order to be held criminally responsible for the acts of another, "there must be proof that the aider and abettor associated himself with the venture, acted with the knowledge that an offense was to be committed, and shared the principal's criminal intent." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998) (citing Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). There is no requirement that the State "elect between prosecution as a principal actor and prosecution for criminal responsibility[.]" State v. Hodges, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing State v. Williams, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)).

Here, the evidence established that Burress, who was driving the red pickup truck, followed the school bus. When Jones, Simmons, and Eubanks, the three victims in these counts, exited the bus, Burress followed the victims so that Gustus could shoot at them. When Gustus fired the shots, the victims ran for cover, and Burress pursued them so that Gustus could fire additional shots at the victims as they ran down the street. Following this shooting incident, Burress engaged in a high speed chase to avoid capture. The evidence established that Burress acted with the intent to promote or assist the commission of the aggravated assault offenses against these three victims by aiding Gustus in shooting at the victims. See T.C.A. § 39-11-402(2). Accordingly, we conclude that the evidence is sufficient to sustain Burress's three convictions for aggravated assault.

-12-

**C. Burress's Conviction for Theft of Property.** Burress also argues that the State presented no proof that he stole Rodney Billingsley's pickup truck. We conclude that the evidence was sufficient to sustain the theft conviction because Burress never provided a satisfactory explanation for why he was in possession of the stolen truck.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a) (2010). As relevant in this case, the term "deprive" means to "[w]ithhold property from the owner permanently or for such a period of time as to substantially diminish the value or enjoyment of the property to the owner[.]" Id. § 39-11-106(a)(8)(A) (2010). Theft of property valued at $1000 or more but less than $10,000 is a Class D felony. Id. § 39-14-105(3) (2010).

Viewed in the light most favorable to the State, the evidence at trial showed that Officer Allen saw Burress driving a red Ford F-150 pickup truck that had been reported as stolen. Officer May testified that Eubanks told him Burress was inside the red pickup truck when the shooting incident occurred. It is well established that unsatisfactorily explained possession of recently stolen goods permits an inference, in light of the surrounding circumstances, that the individual in possession stole the property or knew that it was stolen. See, e.g., Bush v. State, 541 S.W.2d 391, 397 n.5 (Tenn. 1976); State v. Anderson, 738 S.W.2d 200, 202 (Tenn. Crim. App. 1987). Whether property is considered recently stolen "depends upon the nature of the property, and all the facts and circumstances shown by the evidence in the case." Bush, 541 S.W.2d at 397 n.5; Anderson, 738 S.W.2d at 202. Based on the evidence presented at trial, the truck in this case qualified as "recently stolen." Moreover, Burress offered no explanation regarding his possession of the truck. Because the evidence established that Burress was driving the truck without the permission of the owner, Rodney Billingsley, it was the jury's prerogative to infer that Burress stole the vehicle. Accordingly, the evidence is sufficient to support Burress's conviction for theft.

**II. Denial of Mistrial.** Burress and Gustus argue that the trial court should have granted a mistrial when Officer May testified that his primary purpose was to investigate gang activity after the court ruled that gangs could not be mentioned at trial. Burress also argues that trial court should have granted a mistrial after the State committed a Bruton violation.

The decision to grant or deny a mistrial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146 S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "'In other

words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "'The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The party seeking a mistrial has the burden of establishing the necessity for a mistrial. Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388). In determining whether a trial court abused its discretion in granting or denying a mistrial, this court should consider the following factors: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing State v. Lawrence Taylor, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003)).

**A. Officer's Comments about Gangs.** Burress and Gustus argue that the trial court should have granted a mistrial when Officer May testified that his primary purpose was to investigate gang activity after the court granted a motion in limine precluding the mention of gangs at trial. Burress specifically argues that Officer May's comment about gangs was extremely prejudicial because it allowed the jury to believe that Burress was in a gang, even though no other evidence presented at trial supported this inference. He also claims that Officer May's comment affected the jury's verdict given the weakness of the State's case, which he claims consisted primarily of reminding Woods of her testimony from the juvenile transfer hearing and of Ronald Madden's testimony that directly contradicted Woods's testimony. Gustus claims that the trial court should have granted a mistrial in this case because the State elicited Officer May's testimony, creating a "prejudicial mindset" in the jury that he was in a gang, because the trial court failed to give a curative instruction, and because the evidence was far from overwhelming in light of the conflicting testimony, lack of fingerprints, and negative gunshot residue tests.

Just prior to trial, Burress filed a motion in limine asking the court to preclude "any testimony in the foregoing case in relation to gangs or gang activity" because such testimony would "only be used to inflame the jury and would serve no purpose in the instant case." The record indicates that Gustus also filed a similar motion in limine, but a copy of this motion was not included in the record. In a hearing immediately prior to the start of trial, the court ruled that "nothing concerning gangs shall be mentioned until there is an out-of-jury hearing [pursuant to Rule 404(b)]."

During trial, the court conducted two 404(b) hearings out of the presence of the jury wherein the parties questioned Jamichael Eubanks and Officer May. During these hearings, Eubanks testified that although he knew Burress and Gustus from Brainerd High School, he

did not know if Burress or Gustus were in a gang. He stated that Frederick Jones, Jr., was his friend and that Jones was not in a gang. Eubanks did not recall telling the police that the shooting occurred because Burress was in the Rolling Sixties Crips gang or that Burress and Jones had a history of fighting. Officer May testified that he worked in the crime suppression unit, which was "a de facto unit with multi-faceted jobs, but, ideally, targeting gang members and keeping up with gangs." Following the wreck, Officer May interviewed Jamichael Eubanks, who said that Jones and Burress "had had a beef going back a long time over a female and had been going back and forth at the Eastdale Rec[reation] Center." Officer May said that Eubanks disclosed that he had been a member of the Eastdale Bloods gang for the last couple of months and that Burress was in the Rolling Sixties Crips gang. He did not tell him whether Gustus was in a gang. Eubanks also told him that Jones and Burress had ongoing problems over a woman and that the shooting incident "may have been prompted by the gang activity" because Burress and Jones were in opposing gangs. On cross-examination, Officer May stated that Burress had never admitted to him that he was in a gang. Following this testimony, the court commented that the mention of gangs merely brought in "some prejudicial matter" that did not appear "to be overly probative." The court later noted, "[I]f it w[ere] pretty clear cut that gangs were involved [in this shooting] and this was a feud or fight going on between gangs, I think that would be an exception to 404(b) as a motive, but I really don't see that as strong testimony, I'll be honest with you." The court said that it would consider the admissibility of gang testimony over the lunch break.

Later, in the presence of the jury, the following exchange took place between the State and Officer May during direct examination:

> Q.    And what do you do with the Chattanooga Police Department?
>
> A.    I am currently assigned to the crime suppression unit.
>
> Q.    And what is the crime suppression unit?
>
> A.    We're essentially the de facto gang unit within the city. We identify gang members, keep track of them and have a myriad of responsibilities.

At that point, the following bench conference was had in the presence of but out of the hearing of the jury:

> [Burress's attorney]:    We'd asked that [information regarding gangs] be kept out and he's brought it back in again. I'm

|                      |                                                                                     |
| :------------------- | :---------------------------------------------------------------------------------- |
|                      | asking for a mistrial again.  I think he's brought it in about gangs–                |
| State:               | I asked him what he did.                                                             |
| Trial court:         | I think everyone else that's testified has said the same thing, talking about a gang unit? |
| [Gustus's attorney]: | He basically said that's all he does . . . and it's now put in the jury's mind this is a gang case. |
| [Burress's attorney]: | Before, the others just do everything else, but he said specifically they're for gang members and everything. |
| Trial court:         | I'm going to let him testify as to what he does. You know, you can broaden it out he's a police officer to make him soften that a little bit, if you will. |

The State continued its direct examination of Officer May:

Q.     What does the crime suppression unit do?

A.     We have a lot of responsibilities, but our main focus is gang members, identifying gang members and keep[ing] track of them.

Q.     Other than identifying gang members and keeping track of them, what are your other responsibilities with regard to the crime suppression unit?

A.     We assist federal agencies, warrant roundups. We're kind of a catch-all unit.  We assist other divisions within our, within the department; homicide, property crimes.  Our unit, essentially, we know a lot of people, there's a ten-man unit, we know a lot of people and we go out and we find persons of interest and such.

At the time of Officer May's first comment, the trial court apparently had not made a final ruling on the record about the admissibility of gang evidence.  However, the trial transcript and other parts of the record indicate the parties understood that evidence regarding gangs

would be inadmissible. While Officer May's remark was in response to a question by the State, it does not appear that the State intentionally elicited it because other officers testified about their duties without incident. Moreover, although Burress's attorney asked for a mistrial during the bench conference, neither defense attorney asked for the trial court to give a curative instruction to the jury regarding Officer May's comment. The trial court, rather than providing a curative instruction, instructed the State during a bench conference to "broaden" Officer's May's description of the duties of the crime suppression unit to avoid the implication that this was a gang case. While the State could have asked for a five minute recess to properly address this issue with Officer May, the State likely believed that Officer May had heard the court's instruction and would avoid any mention of gangs in the future. Officer May's first and second comments were fleeting, and he never stated that Burress was a gang member or that the case involved gangs. Finally, the evidence in this case, while largely circumstantial, was overwhelming. For these reasons, Burress and Gustus have failed to establish that the trial court abused its discretion in denying a mistrial based on Officer May's comments.

**B. Alleged <u>Bruton</u> Violation.** Citing <u>Bruton v. United States</u>, 391 U.S. 123 (1968), Burress also contends that the trial court should have granted a mistrial when Officer Morrison referenced an out-of-court statement by Gustus implicating Burress. Burress argues that either the State failed to prepare Officer Morrison or that Officer Morrison intentionally gave the objectionable testimony and that the trial court should have granted the mistrial because this <u>Bruton</u> violation "irrevocably damaged" his trial.

During direct-examination, Officer Morrison testified that he had generated a report based on his interview with Gustus at the hospital. At that point, Burress's attorney asked to approach, and the following bench conference occurred in the presence of but out of the hearing of the jury:

| | |
|---|---|
| [Gustus's attorney]: | Judge, we're going to object to this [arrest report] being entered. |
| [Burress's attorney]: | He's trying to introduce the arrest report, so, he can't do that. |
| [The State]: | It is a redacted version of his statement written down by the officer, contempora[neously]– |
| The Court: | He took an oral statement and this was just to refresh his memory about the oral statement in it. |

| [Burress's attorney]: | He wants to introduce [the arrest report] into evidence. |
|---|---|
| [Gustus's attorney]: | Yeah, it's hearsay upon hearsay. |
| [The State]: | [Officer Morrison] generated a report shortly after taking the statement from [Gustus], in which he writes down what the defendant tells him. |
| The Court: | He can testify [about] what the defendant told him, he can refresh his memory with that, but I'll sustain the objection [about admitting the arrest report into evidence]. |

Following this bench conference, the State had Officer Morrison's report, which was generated by him shortly after taking Gustus's statement, marked for identification. Then the State asked the following questions of Officer Morrison:

> Q: Now, after Mr. Gustus waived his <u>Miranda</u> rights, you did take a statement from him?
>
> A: That's correct.
>
> Q: Initially, when you spoke to him, did he tell you what happened?
>
> A: He did say, his first story that he gave, that he didn't know anything about a shooting, that he was picked up and that–he was picked up by Mr. Burress and then he fled the scene, upon a traffic stop. But Mr. Gustus said that he had no knowledge of a shooting.

Then Burress's attorney again asked to approach the bench, and the following bench conference occurred:

| [The State]: | See, that's the problem. If I can admit the statement, then there's not going to be any issues with <u>Bruton</u>. |
|---|---|
| [Burress's attorney]: | Saying what he told what my person did and everything else like that. |

| | |
|---|---|
| [The State]: | I have instructed him that he– |
| The Court: | Well, he can talk about himself, what he's done, and then I'll sustain as far as Mr. Burress is concerned. You want me to caution the jury? |
| [Burress's attorney]: | Yeah, caution the jury, but I mean, it's hearsay. I'm almost ready to ask for a mistrial. |
| The State: | Should I admonish him again, I mean outside the presence of the jury or you want me to do it right now? |
| [Burress's attorney]: | I think it needs to be done outside. |

The court took a five-minute recess to allow the jury to leave the courtroom. During this recess, the following exchange took place:

| | |
|---|---|
| The Court: | Objection was made at the bench in regard to the statement from Detective Morrison from [Burress's attorney] on behalf of his client in regard to anything being mentioned about Mr. Burress, and which has been sustained. |
| [Burress's attorney]: | And of course I made [a] motion for a mistrial and the Court has denied that, correct? |
| The Court: | Well, you said you're getting close to asking for a motion for a mistrial, are you doing that? |
| [Burress's attorney]: | Yes, Your Honor, I am. |
| The Court: | Well, I think from what I've heard, [it's] very hard to understand what the officer said, so I don't think that arises to the manifest necessity, I think there can be curative steps taken to make sure, and I'll be glad to give a curative instruction that this officer, any statement taken by Mr. Gustus shouldn't refer to anyone else at all and they should . . . not consider that. |

-19-

The State then voir dired Officer Morrison about the fact that he was precluded from mentioning any comment that Gustus made about Burress when testifying about Gustus's statement. The trial court denied the motion for a mistrial, stating, "[It was] very difficult to understand at that point in time, I think, what the detective was talking about, but based upon the request of [Burress's attorney], I will indicate to the jury that they should not consider anything said to the detective by Mr. Gustus in regard to anyone else, [that] anything else should not be considered by them at all."

When the jury returned to the courtroom, the trial court gave the following curative instruction:

> Members of the jury, prior to you going out for the short recess, the Detective Morrison was asked certain questions and started giving you a response as to when he talked to defendant Gustus as to what he said. In that brief remark, he started to indicate that another name was mentioned, someone else is mentioned. You should not consider anyone else in regard to the statement of Mr. Gustus other than Mr. Gustus. And I will give you instructions in regard to how you may consider that at a later date or in the instructions later, but you are not permitted to consider any statement about anyone else, should not consider that in your deliberations at all, this only concerns Detective Morrison's interview with defendant Darius Jerel Gustus.

Burress contends that the trial court should have granted a mistrial because Officer's Morrison's statement constituted a Bruton violation. Admission of a non-testifying codefendant's confession implicating the defendant at a joint trial violates a defendant's constitutional right to confrontation. Smart v. State, 544 S.W.2d 109, 111-12 (Tenn. 1976) (citing Bruton, 391 U.S. at 126). While we agree that Officer Morrison's remark was a Bruton violation, not every Bruton violation justifies a reversal of the conviction. State v. Elliot, 524 S.W.2d 473, 478 (Tenn. 1975) (citing Harrington v. California, 395 U.S. 250, 254 (1969)); Schneble v. Florida, 405 U.S. 427, 430 (1972). If "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison[,]" then the improper use of the admission is harmless beyond a reasonable doubt. Schneble, 405 U.S. at 430; see Elliot, 524 S.W.2d at 478. Reversal is not required unless it is proven beyond a reasonable doubt that the error complained of contributed to the verdict. Chapman v. California, 386 U.S. 18, 24 (1967).

The record shows that although Officer Morrison's comment was in response to the State's question, the State did not intentionally elicit the challenged testimony. At the time of the statement, the court sustained the defense's objection to the admission of the police report outlining Gustus's statement but denied a mistrial and instead gave the jury a curative

instruction telling the jury to disregard the statement about Burress. Officer Allen and Woods testified that Burress was in the truck when shots were fired. Officer Mays testified that Eubanks had told him that Burress was inside the truck when shots were fired from the truck. This proof did not depend upon Officer Morrison's remark. While Officer Morrison's comment was improper, it was brief, and the trial court promptly provided an effective curative instruction. See State v. Dick, 872 S.W.2d 938, 944 (Tenn. Crim. App. 1993). We must presume that the jury followed the trial court's instructions not to consider Officer Morrison's improper remark. State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994) (citing State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987)). In reaching this decision, we note that "'[a] defendant is entitled to a fair trial but not a perfect one.'" Bruton, 391 U.S. at 135 (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)). Given the evidence presented in this case, "we conclude that the minds of an average jury would not have found the State's case significantly less persuasive had the testimony as to [Gustus's] admission been excluded." Schneble, 405 U.S. at 432 (internal quotation marks omitted). Because the comment did not result in a miscarriage of justice and did not preclude an impartial verdict, Burress has failed to show that the trial court abused its discretion in denying the motion for a mistrial.

III. **Admission of Bandanas into Evidence.** Gustus argues that the trial court erred in allowing the State to admit two bandanas that were found in the truck after Burress and Gustus fled from the scene of the wreck. He claims that these bandanas should not have been admitted because the State failed to establish a proper chain of custody. We conclude that the trial court properly admitted this evidence.

On direct examination, the State asked Officer May if he recalled the collection of bandanas from the wrecked red Ford F-150. During the ensuing bench conference, the following exchange took place:

| [Burress's attorney]: | While he may go ahead and recall it, he's not the one that–I think somebody else went ahead and collected them and everything else. |
|---|---|
| [The State]: | I don't have to have the person who collected it as long as he can say that those bandanas are the ones collected from the truck. |
| The Court: | Just as long as he can properly authenticate them, identify them. |

| | |
|---|---|
| [Burress's attorney]: | Yeah, because I mean he's not the one that collected them, so there's a chain of custody thing here, Your Honor. |
| The Court: | If he can identify them. |

In the presence of the jury, Officer May identified two bandanas as the bandanas that were collected from the red Ford F-150, and the State asked that the bandanas be entered into evidence. During a bench conference, the court held that Officer May had not yet properly authenticated the two bandanas for admission.

In the presence of the jury, the State asked Officer May how he knew that these bandanas at trial were the same bandanas collected from the red truck, and Officer May replied that he had observed the bandanas in the truck, although he was not the officer who collected them. At that point, the trial court allowed the State to mark the two bandanas for identification purposes only because it wanted "more authentication" of them. After detailing the manner in which the Chattanooga Police Department collected evidence, the State again asked for the exhibit containing the bandanas to be admitted, which prompted another bench conference where the following exchange occurred:

| | |
|---|---|
| [Burress's attorney]: | He still has the same problem. He said he saw the bandanas, but not how they were collected, who collected them. |
| The Court: | He says he was sure that those were the bandanas. You all can cross-examine [him] on that. |
| [Gustus's attorney]: | Chain of custody. |
| [Burress's attorney]: | I mean that's not what we can go with. I mean how[] [doe]s he know [these are the same bandanas]? He's not the one that picked them up. He saw bandanas. There's nothing to go ahead and show that these are the bandanas that he saw. So I mean how can he go ahead and do that? |
| [Gustus's attorney]: | Chain of custody, Your Honor. |
| The Court: | That's not the strongest, but he's identified them, so I'm going to let them in. |

-22-

During cross-examination by Burress's attorney, Officer May repeatedly stated that the bandanas admitted into evidence were the same bandanas collected from the truck because he had been able to observe them inside the truck. When Burress's attorney objected on the basis that Officer May was not answering the question, the State disclosed during a bench conference that the reason Officer May was responding the same way every time was because the bandanas in the truck were baby blue and dark blue, which were gang colors, and he had been instructed not to mention gangs in his testimony. The court stated that Officer May had "probably answered all he's going to answer." At the time, the trial court was under the impression that Officer May had seen the bandanas placed into the evidence bag, which the defense denied.

When cross-examination continued, Officer May acknowledged that he had not seen the bandanas being placed in the evidence bag. He further acknowledged that the bandanas in the truck could have been bought in any store. Then Burress's attorney asked Officer May, "[S]o you believe these are [the bandanas] but you're not quite sure because you didn't see that collection, [did not] see them actually put in these bags and sealed?" Officer May responded, "I have immaculate trust in my team that that was the evidence that was collected from the truck." Officer May said he observed these two bandanas when he came "[w]ithin inches" of the truck a short time after the wreck. However, he acknowledged that he was not there when the truck was wrecked and did not know how the bandanas got into the truck or to whom they belonged.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Therefore, the question of whether tangible evidence has been properly authenticated is left to the discretion of the trial court. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). The trial court's determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998 (citing Beech, 744 S.W.2d at 587). Therefore, we will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

To admit tangible evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. Cannon, 254 S.W.3d at 296; Holbrooks, 983 S.W.2d at 700 (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982)). This rule ensures that "'there has been no

tampering, loss, substitution, or mistake with respect to the evidence.'" Scott, 33 S.W.3d at 760 (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, absolute certainty of identification is not required. See State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing Ritter v. State, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970)). In addition, an item may be admitted even if the State fails to call each witness who handled the item. Cannon, 254 S.W.3d at 296 (citing State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." Kilpatrick, 52 S.W.3d at 87. "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." Id. at 296.

To buttress his argument that the bandanas should not have been admitted, Gustus claims that his case is distinguishable from State v. Oscar Dimery, No. E2010-01430-CCA-R3-CD, 2012 WL 171939 (Tenn. Crim. App. Jan. 20, 2012). In Oscar Dimery, the defendant asserted that the trial court erred in admitting the defendant's clothing into evidence because the State established an insufficient chain of custody. Id. at *8. The defendant argued the State failed to sufficiently establish the identity of the clothing because no witness could testify that the clothing had been taken from the defendant, because no inventory sheet existed, and because the evidentiary procedures had not been followed. Id. The detective, who interviewed the defendant while he was wearing the clothes in question, signed the property receipt when the items were collected at the jail and later signed a form showing that he collected the defendant's clothes and took them to the Tennessee Bureau of Investigation for testing. Id. at *6-7. This court held that the trial court did not abuse its discretion by admitting the evidence because the trial court only admitted the clothing that the officer could identify and excluded the clothing that the officer could not identify. Id. at *9. In reaching this decision, the court concluded that the "circumstances surrounding the evidence reasonably establish[ed] the identity of the evidence and its integrity.'" Id. at *9 (quoting Scott, 33 S.W.3d at 760).

Gustus argues that unlike the officer in Oscar Dimery, Officer May "did not take any physical action to place himself within the chain of custody." Instead, he claims Officer May merely observed the two bandanas in the truck and asserted that the bandanas presented to him at trial were the same bandanas that he saw inside the truck. Moreover, he asserts that unlike the officer in Oscar Dimery, Officer May "was unable to give any distinguishing factors [regarding] the bandanas that would differentiate [them] from others." Finally, he claims that unlike Oscar Dimery, there were no alternate means of identifying bandanas, such as comparing them to photographs that were taken at the time they were collected. Gustus argues that if the bandanas had not been admitted into evidence, then there would have been "additional questions as to the identity of the shooter." He also claims that by allowing them

in, "additional evidence was supplied to the jury to corroborate . . . the prejudicial statements made involving gangs."

As we previously noted, the jury never heard evidence that Burress or Gustus were in a gang or that the bandanas in this case represented gang colors. The record shows that the defense thoroughly cross-examined Officer May regarding his identification of this evidence, which gave the defense an opportunity to diminish the weight of this evidence to the jury. Because the facts and circumstances surrounding the bandanas reasonably established the identity and integrity of this evidence, we conclude that the trial court did not abuse its discretion in admitting them.

**IV. LaJuana Woods's Unavailability to Testify.** Burress argues that the trial court erred in determining that LaJuana Woods was an unavailable witness pursuant to Rule 804(a)(5) because the State was unable to locate her. He also argues that the State never requested that Woods be declared unavailable for lack of memory pursuant to Rule 804(a)(3). Burress claims that after the defense was able to procure Woods's appearance at trial, the trial court erred in allowing the State to question Woods as an adverse witness and erred in allowing the State to have Woods read from the transcript from the juvenile court transfer hearing rather than requiring her to refresh her recollection from the transcript before testifying and then attempting to impeach her. Burress claims that he did not waive this issue by failing to make a contemporaneous objection because he objected at the beginning of Woods's testimony. We conclude that because LaJuana Woods was unavailable for lack of memory under Rule 804(a)(3), her juvenile court testimony was admissible as substantive evidence under rule 804(b)(1).

During trial, the State notified the court that Woods had failed to appear at trial and that it was requesting that Woods be declared unavailable so that it could admit her testimony from Burress's and Gustus's juvenile court transfer hearing. Gustus's attorney objected, arguing that Woods was not unavailable because she had been present for the first day of trial, though the State failed to call her to testify, and because the State had failed to subpoena her with a court-issued subpoena. When Burress asked that the court read Woods's testimony from the juvenile court transfer hearing before making a determination regarding the reliability of the prior testimony, the court stated that it had already reviewed the transcript from the juvenile court hearing.

After hearing testimony from an investigator in the district attorney's office, a lieutenant in the sheriff's department, and an investigator with the police department, the trial court found that Woods was unavailable because she intentionally failed to appear at trial after the State had made every effort to have her appear. It also found that the juvenile court

transfer hearing carried its own indicia of reliability.  A short time later, the defense was able to procure Woods's appearance at trial by having Woods's former attorney contact her.

In the presence of the jury, Woods testified that she knew Burress and Gustus but did not remember anything that happened on December 7, 2010.  When Woods said that she could not remember anything about a shooting incident involving a red truck on December 7, 2010, the State presented her with a copy of the transcript from the juvenile court transfer hearing to refresh her recollection.  Woods then asked to speak to the trial court, and the jury was excused.  During the jury-out hearing, Woods said, "I have been through surgeries, high risk pregnancy, almost lost me and my child, and I'm on medications, so I'm trying to figure out how I should remember everything."  She stated that the only thing she remembered from December 7, 2010, was the wreck.  She also said that she had been in a wreck the previous night, which had caused her to lose her hearing.  The court instructed Woods to testify truthfully based on her recollection of events.

When the jury returned, Woods testified that she could not recall being picked up by Burress in a red truck on December 7, 2010.  She acknowledged that she had talked to the State about this case within the last week but asserted that her answers to the State's questions during that meeting had come from the juvenile court transfer hearing transcript and not from her independent recollection of those events.  At that point, the State asked that it be allowed to treat Woods as an adverse witness, which the court granted.  Woods again stated she did not remember Burress picking her up in a red truck on December 7, 2010, and did not remember giving prior testimony about the December 7, 2010 incident.  She denied that she was feigning memory loss because she had been threatened.

The State requested that Woods review the transcript from the prior hearing and then asked if she could remember testifying about why she left her home on December 7, 2010.  When Woods said she could not recall her testimony in response to that question, the State asked her to read her answer from the transcript.  She then read that Burress had picked her up.  When Woods said that she no longer remembered her testimony from the prior hearing, the court told her to "[a]nswer his questions as best you can."  At that point, the State asked Woods the same questions that she had been asked at the prior hearing and then had Woods read her response from the transcript.  By having Woods read her responses from the prior hearing, the State was able to present evidence that Burress had picked up Woods in a red pickup truck, and she had sat between Burress, who was driving, and Gustus, who was in the passenger seat.  When Woods first got in the truck, a small gun was lying in the middle seat where she was going to sit, and she moved it to the floorboard of the truck.  She said that the truck ended up behind a bus, and when some of the teenagers in the bus began staring at them, Gustus fired four shots at a boy, although she did not know the boy's name.  When Gustus began shooting, the boy ran.  Woods said that there were other teenagers around when

Gustus started shooting at the boy and that Gustus used the gun that she had previously moved to the floorboard of the truck. After the shooting incident, Burress drove them through the Wilcox Tunnel, and they got stopped by an officer. When the officer never got out of his patrol car, Burress drove off and wrecked the truck following a high-speed police chase. Following the wreck, Woods said that she, Burress, and Gustus ran in different directions. After reading her prior testimony, Woods said that the transcript did not refresh her recollection about what had happened on December 7, 2010.

Initially, we note that Burress's argument that the trial court erred by determining that Woods was unavailable pursuant to Rule 804(a)(5) is moot because Woods ultimately testified at trial. As to Burress's complaints about the manner in which the State questioned Woods, we note that neither Burress's nor Gustus's attorney ever objected to the State treating Woods as an adverse witness or having Woods read her responses from the juvenile court transfer hearing transcript at trial. Consequently, any issue about Woods reading her testimony from the prior hearing at trial is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Waiver notwithstanding, we note that Woods's prior testimony was admissible because she was an unavailable witness based on lack of memory pursuant to Rule 804(a)(3), which allows for sworn prior testimony of an unavailable witness to be read to the jury at trial. See Tenn. R. Evid 804(a)(3), Advisory Comm'n Comment to 1994 Amendment ("Memory lapse, if demonstrated to the trial judge under Rule 104(a), is enough to get the contents of recorded recollection read to the jury, and the same condition should be enough to get cross-examining sworn former testimony before the jury."). Although the trial court never formally declared Woods to be unavailable pursuant to Rule 804(a)(3) for lack of memory, the record clearly shows that Woods was unavailable because she demonstrated a lack of memory of the subject matter of her prior testimony. While it would have been preferable for the court to formally make the determination that Woods was unavailable under 804(a)(3) out of the presence of the jury, had the court done so, the substance of Woods's testimony before the jury would have been substantially the same as what the jury heard in this case.

Moreover, there was no question that Woods's prior testimony from the juvenile court transfer hearing was reliable, even though it was hearsay under Tennessee Rule of Evidence 801(c), because Burress and Gustus had a similar motive and opportunity to cross-examine Woods in that prior hearing. See Tenn. R. Evid. 804(b)(1) (stating that former testimony by an unavailable declarant "given as a witness at another hearing of the same or different proceeding" is a hearsay exception "if the party against whom the testimony is now offered

had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination"). This court has held that a juvenile transfer hearing, which determines whether there are reasonable grounds to believe that a defendant committed alleged acts, is reliable. See State v. Summers, 159 S.W.3d 586, 598 (Tenn. Crim. App. 2004); T.C.A. § 37-1-134(a)(4). Accordingly, we conclude that the trial court did not abuse its discretion in admitting Woods's prior testimony based on her unavailability for lack of memory. See State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008) (stating that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record").

## CONCLUSION

We conclude that the evidence is sufficient to sustain Burress's convictions for aggravated assault and theft and Gustus's conviction for aggravated assault against Jones. We further conclude that the trial court did not abuse its discretion in denying a mistrial based on the admission of gang testimony and the Bruton violation, that LaJuana Woods was an unavailable witness pursuant to Tennessee Rule of Evidence 804(a)(3), which made her prior testimony from the juvenile court transfer hearing admissible as substantive evidence, and that the trial court did not abuse its discretion in admitting the two bandanas into evidence. Upon review, the judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE